FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

97 SEP 24 AM 11: 41

U.S. DISTRICT COURT
N.D. OF ALABAMA

P. DAVID BAILEY and DORIS BAILEY,      )
                                       )
        Plaintiffs,                    )
                                       )
vs.                                    )      CV 96-PT-0631-S
                                       )
ALLGAS, INC., et al.,                  )
                                       )
        Defendants.                    )

# ENTERED

SEP 2 4 1997

---

## Memorandum Opinion

---

This cause comes on to be heard on a motion for summary judgment filed by defendants Allgas, Inc., ("Allgas"), Lampton-Love, Inc., ("Lampton-Love"), Liquified Petroleum Gas Management ("Liquified Petrol") and William Ervin ("Ervin") on March 24, 1997. Incident to their motion, the defendants have filed motions to strike the affidavits of Max Bailey, the brother of one of the plaintiffs, P. David Bailey, and William Gunther ("Gunther"), the plaintiffs' expert. On Thursday, May 22, 1997, this court held a telephone conference on several issues relevant to the contentions of the parties on the present motion. Subsequent to the conference, the plaintiffs and defendants sent to this court their respective arguments on whether this court should sever the trial of this cause, holding an initial trial only on the issue of Allgas's liability and, if that trial results in a favorable verdict for the plaintiffs, holding a subsequent trial on the liability of the other defendants.[1]

With respect to the summary judgment motion, the defendants contend that the plaintiffs'

---

[1] The court held another telephone conference on June 11, 1997.

claims are not grounded in either law or fact. In their complaint, the plaintiffs, P. David Bailey ("David Bailey") and Doris Bailey, allege that the defendants violated the Robinson-Patman Act, that the defendants tortiously interfered with the business relations of their company, The Bailey Gas Company, that the defendants violated the Alabama Motor Fuel Marketing Act ("AMFMA") and that the defendants engaged in unfair trade practices under Alabama law. In their motions to strike, the defendants claim that the Max Bailey affidavit contains testimony that the plaintiffs are not able to present because Max Bailey is not a qualified expert and/or it is not based on personal knowledge and that Gunther's report is inadmissible because Gunther is unqualified and the report relies upon bad data and bad economic science.

## Facts

In August of 1994, David Bailey, recently divorced from his career at Allgas, opened The Bailey Gas Company ("Bailey Gas") with the idea of selling propane gas in the twenty-mile area around Susan Moore, Alabama. He started his business with a $400,000 loan from the Small Business Administration and a $100,000 personal loan. To gain a competitive edge in the domestic propane market, Bailey Gas offered free tank rental to customers buying their propane from Bailey Gas.[2]

Meanwhile, ten miles down the road in the town of Altoona, Allgas, David Bailey's former employer, was allegedly hatching a plan to drive Bailey Gas out of business. Allgas would, allegedly, severely undercut Bailey Gas's prices, making it impossible for Bailey Gas to get a foothold in the local market and crippling its prospective fortunes. Purportedly, David Bailey's brother, Max Bailey, who was then running the Altoona office for Allgas, found out about the scheme to put Bailey Gas out of business, quit Allgas and went to work for David. The day after Max Bailey went to work for his brother's business in August, Allgas allegedly put its scheme into effect.

The alleged plan by which Allgas meant to put Bailey Gas out of business was to reduce

---

[2] Most users of propane gas rent their tanks. Tank rental runs $20-$50 annually, depending upon the size of the tank. There may be an issue of whether the defendants' price cutting could have been a legal response to Bailey Gas's free tank offer.

Allgas's prices by over twenty-five percent, from the July price of $.67 per gallon[3] of propane gas to $.50 per gallon of propane gas.[4] Allgas dropped the prices in August (at approximately the same time as Bailey Gas opened) and kept them at that level until late December 1994, when the wholesale price of the gas that it sold rose. Allgas then raised its prices to $.65 per gallon. From the beginning to the middle of 1995, Allgas raised its prices back to those of its competitors in the Altoona area. Throughout this period, Allgas apparently charged lower prices to customers purchasing propane from its Altoona office than from its other offices.

By August 1995, Bailey Gas was out of business. David Bailey blames Allgas, his former employer, for dousing his business prospects. Allgas contends that the unseasonably warm winter in 1994 and 1995 was largely responsible for the failure of Bailey Gas.

Propane gas is used for a variety of purposes, from heating homes to powering gas appliances, to use as a motor fuel. The plaintiffs claim that the plan of Bailey Gas was to sell propane gas as both a domestic heating fuel and as a motor fuel. The plaintiffs aver that they had no desire to enter the market selling propane to commercial entities.

The defendants contend that in the twenty to twenty-five mile area around Susan Moore, where Bailey Gas was headquartered, there were eight companies in the business of selling propane gas: Allgas, Amerigas Gas, Country Gas, Dowdle Butane Gas, Empire Gas, Ferrell Gas, Jordan Gas and Southland Gas. The plaintiffs disagree with that assessment and counter that some of the listed companies have a negligible impact (if any) in the domestic/residential market surrounding Susan Moore. As to those competitors who do have a market presence, the plaintiffs and defendants have markedly different perceptions of their strength.

## Contentions & Analysis

Before reaching the defendants' arguments as to the validity of the plaintiffs' substantive

---

[3] Neither the plaintiffs nor defendants are very clear on this point, stating a price ranging from $.67 per gallon to $.69 per gallon.

[4] The drop seems substantially greater if the price charged by Allgas during the period of August to December 1994 ($.50) is compared to the price it charged for propane the previous year and the following year. On such a comparison, Allgas apparently reduced its prices between 30% and 50%, resisting seasonal pressures to increase its prices.

claims, the court will address the admissibility of the affidavit of Max Bailey and of the report of William Gunther.

The defendants give five reasons why Max Bailey's affidavit is wholly inadmissible. First, the defendants contend that, although Max Bailey is a lay witness, he allegedly gives expert testimony on the sales percentages of the various propane gas companies in Allgas's Altoona district. Because he is not qualified as an expert capable of giving the opinions that are the subject of his testimony, the defendants argue, his affidavit should be stricken. Second, the defendants contend, Max Bailey's percentages are vague and conclusory. Therefore, maintain the defendants, his testimony does not rely on personal knowledge as required by Federal Rule of Civil Procedure 56(e) and Federal Rules of Evidence 602 and 701. Third, argue the defendants, Max Bailey's affidavit does not "show affirmatively" that he is qualified to testify as to sales percentages of competitors and, therefore, does not comply with Federal Rule of Civil Procedure 56(e). Fourth, the affiant's testimony on sales percentages is irrelevant, the defendants contend, because his testimony refers to activities predating Allgas's alleged predation. Finally, the defendants contend, the affidavit does not prove market share in the relevant geographical market and is, therefore, inadmissible. This last reason offered by the defendants relates to relevancy, so the arguments contained therein will be discussed more appropriately with respect to the substantive aspects of the Robinson-Patman Act claim.[5]

The plaintiffs respond that because Max Bailey, who worked in the propane gas business, is testifying from personal knowledge of the local propane gas industry, he is qualified to give testimony as to market share based solely upon that knowledge. Further, the plaintiffs contend, if the knowledge to which Max Bailey is testifying is expert knowledge, Bailey is qualified to testify to it given his training in the field. Finally, the plaintiffs argue, Max Bailey's testimony as to market share is testimony concerning clear fact determined by his experience and observations made while employed by Allgas.

In their reply, the defendants reassert that Max Bailey is an expert masquerading in a layman's visard. Therefore, they argue, his testimony must be expunged from the record. The

---

[5] The issue of relevant geographical market was negligibly raised in the initial motion for summary judgment, but argument on the issue was expanded both in the defendant's motion(s) to strike and in the May 22, 1997 phone conference. Therefore, it is appropriate to address the arguments offered in the motion(s) to strike and in the phone conference with respect to their impact on the summary judgment motion.

defendants further assert that the plaintiffs have failed to establish that Max Bailey's testimony is not vague and that Max Bailey is qualified to estimate market share around Altoona.

In their bare essentials, the issues raised by the defendants boil down to whether the subject of Max Bailey's testimony is to be considered expert or lay knowledge and to whether Max Bailey's testimony as to that knowledge is "vague and conclusory" or substantial and verifiable based on personal knowledge.[6]

On the issue of whether the subject of Max Bailey's testimony is expert or "lay" knowledge, the defendants argue that Max Bailey could only have come to his conclusions based upon his knowledge, skill or expertise obtained by working as an Allgas employee, not based on first-hand personal knowledge. The plaintiffs respond that Max Bailey's testimony does not involve any specialized knowledge on his part or inferences from principles of economics, but is instead knowledge of brute fact.

The telling aspect of the defendants' contentions is that nowhere do the defendants attempt to state of what expert character Max Bailey's "knowledge" is. It is therefore unclear whether the knowledge is supposedly of a scientific, specialized or technical variety. Federal Rule of Evidence 702 allows for expert evidence in certain causes:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FED. R. EVID. 702. The threshold issue on whether an expert witness is required to testify as to a

---

[6] If the testimony offered by Max Bailey is expert testimony, it must be disqualified, as the plaintiffs have failed to follow the requirements of Federal Rule of Civil Procedure 26(a)(2) and this court's pretrial order with respect to expert testimony. Additionally, if the testimony is evidence of which Max Bailey has personal knowledge, that his knowledge may prove incorrect or that it is based upon poor or inconclusive investigation will not debunk his testimony on market share due to lack of competence. Federal Rule of Civil Procedure 56(e) requires that:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

"Rule 56(e) [requires] that the affidavit: (1) must be made on personal knowledge of the affiant; (2) set forth facts that would be admissible in evidence; and (3) show affirmatively that the affiant is competent to testify to the matters stated therein." Pfeil v. Rogers, 757 F.2d 850, 860 (7th Cir. 1985). The competency standard in Rule 56(e) is not whether the affiant is qualified to make a factual determination or whether he has sufficient resources on which to assert a fact. "It is clear that the requirement of an affirmative showing applies to the competency of the affiant and not to the admissibility of the evidence. . . ." United States v. Hangar One, Inc., 563 F.2d 1155, 1157 (5th Cir. 1977). Competency to testify does not refer to the testimony itself. "[I]t is sufficient if the statements contained in the affidavit are in fact admissible; the affidavit need not contain any affirmative showing of admissibility." Id.

particular matter is whether that matter concerns scientific, technical or other specialized knowledge.[7] Therefore, in order to have Max Bailey's testimony on market share deemed to be "expert" testimony it must fall into one of these three categories.

The defendants object to the following testimony of Max Bailey:

6. The competition in the Altoona District in 1994 was as follows:

   A. Our (Allgas's) main competitor was from Dowdle Gas which had a store in Snead, Alabama. Snead is about seven miles from Altoona and about three miles from Susan Moore, where Bailey Gas was located. I estimate that Allgas had about 35% to 40% of the Altoona Market and Dowdle had about the same percentage. Dowdle had the Coop as a customer and a much larger percentage of their business was agricultural business than Allgas. I would estimate that Allgas has closer to 50% of the domestic market in the Altoona area.

   B. Of the remaining 20% to 30% of the market[,] the two largest competitors were Ferrell Gas and Country Gas. Ferrell probably had more chicken house business in the territory and Country had a larger domestic business.

   C. The rest of the competitors had very small percentages. This included Amerigas, Jordan Gas and Empire Gas. Southland Gas had very little sales in the area.

7. I have the following comments of the figures presented by Dr. McLeod (the defendants' expert):

   A. Dr. McLeod claims that Jordan Gas made 16.45% of the domestic sales and 9.37% of the total sales in the Altoona District in 1994. Comparable figures are shown in other years. These numbers are totally unrealistic. The document he submits that is marked as Defendants exhibit 2 (Exhibit 2 to this affidavit) shows 31,500 gallons of yearly sales in Blount County. Most of these sales would be in the Altoona District. He show[s] 1,900,000 gallons yearly sales in Etowah County. I believe that almost all of those sales were outside the Altoona District. I estimate that 40,000 gallons of those sales would be in the Altoona District. The Exhibit showed 770,000 gallons in Marshall County. Some of these sales would be in the Altoona District out of the Boaz office but the vast majority of them would be outside the district. I would estimate that 60,000 of those sale[s] would be in the Altoona District. Taking these figures combined, instead of 2,132,000 gallons of Jordan sales in the Altoona District, a more realistic estimate would be 131,500 gallons.

   B. Dr. McLeod estimates that Country Gas had 7.57% of the domestic market and 7.645% of the total market in 1994. Comparable figures appear for the other years. That is probably close to correct. The reason that his figures here are more correct is that the Country Gas office at Rainbow Crossing

---

[7] As opposed to whether the knowledge is opinion or inference derived from personal knowledge and experience. If the opinion is not expert opinion, it may be admissible pursuant to Federal Rule of Evidence 701.

has a similar market to the Altoona District.

C.    Dr. McLeod estimates that Southland had 2.48% of the domestic market and 1.875% of the total market in 1994. Similar figures appear for other years. If anything, that estimate is high. However, because the numbers are low, I have difficulty drawing a fine line to come up with a different estimate.

D.    Dr. McLeod estimates that Dowdle Butane has 4.585% of the domestic and 12.47% overall of the total market in 1994. This, too[,] is a very inaccurate estimate. The Snead store was the biggest competitor of the Altoona store of Allgas. Dowdle was the biggest competitor of Allgas in Altoona. Dowdle's share is underestimated for much the same reasons as why Allgas is underestimated. The Snead store had a very large overlap with Allgas. The Dowdle Snead store went over into Cullman county, but the bulk of their customers were in the same area as Altoona. Their volume is close to correct, but their market share is grossly understated.

E.    Dr. McLeod estimates that Amerigas had 12.04% of the domestic sales in the Altoona district and 13.61% of the total sales in the Altoona district for 1994. Similar figures appear for other years. These numbers are greatly overstated. The main reason that they are overstated is that he has included the Boaz store which operated mainly out[side] of the Altoona District. Amerigas bought the Petrolane business up there which has bloated figures in Marshall County outside the Altoona District. I estimate that Amerigas had less [than] 2% of our market.

F.    Dr. McLeod estimates that Ferrell Gas had 26.92% of the domestic business and 27.54% [of the] total business. This number is totally unrealistic. He has included sales from three stores in Ferrell. None of them does very big business in the Altoona District. The Altoona District does not do business in most of the counties he counted. I estimate that Ferrell Gas has less than 10% of the Altoona market.

G.    Dr. McLeod estimates that Empire Gas has 11.85% of the domestic market and 9.12% of the total market. These numbers are too high, also. The Oneonta office does not compete very much in the Altoona area, and the Arab [office] does not compete at all.[] The Empire percentage would be much lower tha[n demonstrated by] the figures used by Dr. McLeod.

Max Bailey Affidavit pp. 2-4. Max Bailey discussed the market share (or the relative business) of the various competitors in the Altoona district, that area which was served by the Altoona office of Allgas. His observations are, he apparently admits, limited to that confined area.

The divisions between "scientific, technical or other specialized knowledge" and everyday empirically-based knowledge are hard to draw in theory and harder still to draw in practice. <u>See</u> <u>Asplundh Mfg. Div. v. Benton Harbor Engineering</u>, 57 F.3d 1190, 1199 (3d Cir. 1995). Making the distinction so difficult to draw is that the two listed categories are not exhaustive of the kinds of information that an individual may have. For example, an individual may have knowledge of a

theological matter, something that clearly is a form of knowledge, but that does not fall into either of the above listed categories.

Determining whether a belief of an affiant constitutes "scientific, technical or other specialized knowledge," involves a twofold inquiry. The court is not only to determine, one, whether the belief is scientific, technical or otherwise specialized, but, two, whether the belief carries the indica of knowledge. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590 (1993). "Knowledge," as conceived of in this context, need not be irrefutable or unassailable by doubt. The essential aspect of knowledge is reliability. See Id. at 592.[8]

What determines whether the subject matter of a witness's testimony is scientific, technical, specialized or lay is not some intrinsic characteristic of the subject matter. It is, instead, the means by which knowledge of the subject matter of the testimony is reached. A scientific proposition is a

---

[8] In the case of scientific knowledge, a proposition that qualifies as scientific automatically constitutes knowledge. This is the case because of the character of science as self-verifying. Although in Daubert, the Supreme Court stated that evidentiary reliability was tied to scientific validity, Daubert, 509 U.S. at 590 n. 9, the criteria listed by which a scientific proposition was to be identified as scientific knowledge were not truth-based, but were methodological. Id. at 590 ("The adjective 'scientific' implies a grounding in the methods and procedures of science."). A proposition is scientific knowledge not only if it is considered true by the scientific community at large (or generally accepted), but whether the scientific community recognized the propositions to be the result of applied scientific methods, i.e. possible verifiability, (CARL HEMPEL, PHILOSOPHY OF NATURAL SCIENCE), refutablity (KARL POPPER, CONJECTURES AND REFUTATIONS: THE GROWTH OF SCIENTIFIC KNOWLEDGE), increased probability (RUDOLPH CARNAP), work within the permissible scope of "normal science" (THOMAS KUHN, THE STRUCTURE OF SCIENTIFIC REVOLUTIONS), or the development of possible states of affairs (BAS VAN FRASSEN, LAWS AND EXPLANATION). Interestingly, agreement as to a suitable definition of science has not been forthcoming, not only among philosophers and sociologists of science, but also among scientists themselves. (A recent circumstance in which this dispute again rose to the surface was in the interpretation of Sokal's hoax. Sokal, a respected physicist, submitted to SOCIAL TEXT, a journal apparently committed to promulgating numerous "post-modernist" theories of textual interpretation as applied to all text, an article on post-modernist social interpretation of certain physical theory as related to social and political enterprise. After SOCIAL TEXT accepted and published the article, Sokal then wrote a piece for LINGUA FRANCA, exposing his own work as a farce, meant to expose the people in the political-social literary theory circles as speaking nonsense, particularly as it pertained to the sciences. Steven Weinberg, a physicist at the University of Texas at Austin, took this a rallying cry against all social-based theories of science (something Sokal himself disputed) and again raised the banner, for what seems the first time in decades, that the purpose of science is to uncover the underlying (or true) structure of the universe. The debate ensues without resolution.) Examples of propositions of scientific knowledge which are not unanimously heralded by a scientific community as necessarily true, but which are considered viable theories, include cosmological theories of inflation (theories in which the observable universe is nothing but a bubble in which the energy value of certain fields dropped to near zero) and biological theories of genes as the unit of natural selection (theories in which self-catalytic proteins — self-reproducing proteins, such as the one suggested to be at work in mad cow disease — eventually developed into the gene structures of organisms today and whose success or failure in the creation of organisms determines the genes' reproduction rates).

Some courts have taken Daubert as merely a test of "reliable science," not recognizing the phrase to be redundant. In these cases, a proposition is termed, on some ad hoc basis, scientific and is then subjected to the Daubert factors for a determination of reliability. Often, the courts end up with a determination that something constitutes unreliable or "bad" science. However, "bad science" is not science at all. Because the hallmark of science is its methods and because reliability of science is a result of the methods employed, both the determination of whether testimony is scientific and whether it is reliable is one and the same.

proposition reached through methods recognized in the scientific community. A technical proposition is a proposition reached through technical expertise. See Daubert, 509 U.S. at 590. Lay testimony involves everyday empirical propositions, reached through bare observation and common inference. See FED. R. EVID. 701.[9]

It is not unheard of (and is, in fact, quite common) for the same proposition to be advanced as a matter of scientific testimony, technical testimony and/or lay testimony. For example, a biologist specializing in avian behavior may be able to determine the percentages of birds of various species occurring in an individual's backyard, based upon knowledge of the distribution patterns of those various species. An avid bird-watcher in the locale may be able to provide specialized knowledge as to those percentages based upon his gained experience from local bird watching. The individual in whose backyard the birds reside may also be able to provide testimony as to those percentages, not through scientific inference or specialized knowledge of birds in the area, but through everyday observation of the specific birds' comings and goings.

This brings the court back to Max Bailey's testimony. Perhaps the defendants' expert, McLeod, reached his conclusions about percentages in Allgas's Altoona district by making economic assumptions based upon information provided by the various gas companies operating in northeastern Alabama. If so, his assertions may be the consequence of expert methodology and therefore may be expert in nature. That McLeod's assertions may be expert testimony does not, however, require Max Bailey's assertions to be expert testimony. Max Bailey's testimony does not derive from any knowledge of economic theories or the like. Instead, his testimony apparently derives from his experience at Allgas.

The defendants argue that Max Bailey's testimony based on his experience at Allgas is testimony that is of a specialized or technical nature. However, knowledge gained while working at a business does not necessarily translate to specialized knowledge of the business. Mere observation in the line of work is lay knowledge, even if the person making the observation is in a particularly advantageous position to make the observation because of his employment. Max Bailey's observations, although resulting from his employment with Allgas, were not based upon

---

[9] WRIGHT & GOLD, FEDERAL PRACTICE & PROCEDURE at § 6253, states that whereas an expert may provide an opinion not only on the basis of first hand observation (as may a lay witness), the expert may also testify as to evidence presented at trial or based upon data obtained outside of the courtroom. Lay witnesses are restricted to testimony on opinions drawn from first hand observation.

any specialized methodology or practice employed by propane salesmen in determining the relative sales of other companies within the area. Instead, they were made by simple observation of the activity of competitors in the area.

The second contention of the defendants, that Max Bailey's opinions as to sales percentages in the Altoona district are speculative and not based upon personal knowledge, is a difficult issue. Max Bailey, in stating the relative percentages, often gives little or no reason for the percentages that he does give. The defendants cite Juneau Square Corp. v. First Wisconsin Nat'l Bank of Milwaukee, 624 F.2d 798 (7th Cir. 1980), cert. denied, 101 S. Ct. 571 (1980), for the proposition that an imprecise calculation of percentage of market share is too speculative to be admitted as evidence. However, the "speculative" calculation was made by a supposed expert in Juneau and because no clear methodology for determining the market share number was made, it could not deemed reliable as a source of information because of the bases of its calculation.

Observations by a lay witness pose a different problem of reliability. The statements of a lay witness about a particular subject matter cannot stray too far from the witness's direct observations. See FED. R. EVID. 701. "This requirement is itself divisible into two parts: (1) the witness must have perceived with his senses the matters on which his opinion is based, and (2) there must be a rational connection between the witness'[s] opinion and his perception." WRIGHT & GOLD, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 6254 (1997). "Finally, the opinion or inference must be helpful, either in understanding the testimony or in determining a fact in issue. That the opinion or inference 'embraces an ultimate issue to be decided by the trier of fact' does not affect its admissibility under Rule 701." Lubbock Feed Lots, Inc., v. Iowa Beef Processors, Inc., 630 F.2d 250, 263 (5th Cir. 1980).

The requirement of perception is the same as the requirement that a witness have personal knowledge of what he speaks under Federal Rule of Evidence 602:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of witness' own testimony.[10]

The defendants contend that Max Bailey has not met the personal knowledge requirement of Rule 701 because he never saw receipts of other propane gas companies stating the amount of gallons sold by them in the Altoona district nor did he see other propane companies selling propane gas

---

[10] This is also a requirement contained in Federal Rule of Civil Procedure 56(e).

within the district.  Absent either type of specific knowledge, defendants argue, Max Bailey does not
have the requisite personal knowledge on which to base an opinion.

Personal knowledge is not limited to isolated observations.  It includes complex associations
amongst observations, such as determining that a gun was fired from seeing a shiny metallic glint
and a puff of powder, while hearing a sharp crack.  In addition, personal knowledge includes some
inferences from observations.  There are limitations, however.

> It is true that "personal knowledge" includes inferences--all knowledge is inferential--and
> therefore opinions.  United States v. Giovannetti, supra, 919 F.2d at 1226.  But the
> inferences and opinions must be grounded in observation or other first-hand personal
> experience.  They must not be flights of fancy, speculations, hunches, intuitions, or rumors
> about matters remote from that experience.  Palucki v. Sears, Roebuck & Co., supra, 879
> F.2d at 1572;  Friedel v. City of Madison, 832 F.2d 965, 970 (7th Cir.1987).

Visser v. Packer Engineering Associates, 924 F.2d 655, 659 (7th Cir. 1991).  "The test is 'whether a
reasonable trier of fact could believe the witness had personal knowledge.'"  United States v. Doe,
960 F.2d 221, 223 (1st Cir. 1992)(quoting Folio Impressions, Inc. v. Byer California, 937 F.2d 759,
764 (2d Cir.1991) (citations omitted)).  See also, WRIGHT & GOLD, FEDERAL PRACTICE &
PROCEDURE: EVIDENCE § 6022.

As a salesperson and manager for Allgas, it would be remarkable if Max Bailey had not
observed multiple sales of propane gas in the Altoona district.  Presumably then, Max Bailey was
likely to have knowledge through his customers and prospective customers of Allgas of the goings-
on in his district.  In addition, reasons for market percentages given by Max Bailey indicate that he
had a fair perception of who was selling what to whom while he was with Allgas.  Although his
personal knowledge is not positive or certain, by any means, the failures in Max Bailey's knowledge,
if he testifies at trial, can be exploited by the defendants.  An individual watching the birds in his
backyard come and go could have personal knowledge of the variety and degree of species in his
yard without accounting for every bird.  Similarly, Max Bailey's inferences from the specific
incidences of sales of which he knew to a general idea of the market presence of each competitor in
the Altoona is adequate to count as evidence.  That the inferences might be questionable does not
suffice to limit their admissibility as personal knowledge.  Juries are not so incompetent as to not
know when inferences may be ill-advised.  The court is not willing to determine at this time that a
reasonable trier of fact could not believe that Max Bailey had personal knowledge of the
distribution of sales in the Altoona district.

The second requirement of Rule 701 is that a rational connection exist between the affiant's

perception and the affiant's opinion. Although "lay opinions founded on limited perception may not be rationally based when . . . knowledge and experience of the opinion's subject suggest significant perception is needed to make an accurate generalization," this is not a problem here. WRIGHT & GOLD, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 6254. Max Bailey's observations are confined to the district in which he worked and the time period in which he worked in that district. Taking the testimony for what it is, an account of competition in the Allgas's Altoona district meant to dispute the "scientific" conclusions of the defendants' expert, the inference made is sufficiently limited to be rationally connected to the perceptions of Max Bailey. Sales of propane gas where one can see delivery trucks, tanks, etc., lend themselves to such personal knowledge in a fashion different from in-store sales of various products.

The defendants complain that even if Max Bailey's affidavit is related to his personal observations, the conclusions that he draws are too vague to be of any use for antitrust purposes. It may be the case that Max Bailey's stated market shares might be found less credible because of their general nature, but this is not a reason to strike the affidavit. Perhaps the affidavit is weak and its probative value is lessened by its generality, but this is no reason to prevent application of it to the substantive aspects of this case.[11]

Gunther's report presents a different set of problems. There is no issue that Gunther's report is meant as anything but expert evidence. The defendants complain, however, that Gunther's report is inadmissible because he is unqualified, he has a lack of familiarity with the market on which he issued his report and he utilized a bad methodology to come to his conclusions. The plaintiffs respond that the defendants are incorrect in all of their arguments.

---

[11] In their response to this court's proposed opinion, the defendants argued the following about Max Bailey's affidavit:

> Bailey's affidavit . . . is far too indefinite to support [a finding that Allgas held a 50 percent share of the Altoona market]. In the first place all of Bailey's assessments are "estimate[s]," which are inherently uncertain. More significantly, the best that Bailey does is to "estimate" that Allgas was responsible for "about 35% to 40%" of the propane gas sales within the Altoona district, and that "Allgas has closer to 50%" of the domestic market" in that same area. . . . "Closer to 50%" is not the same as "50%"; indeed, it means only that Allgas had more than 35% of the sales in the relevant area, since a percentage of 36% would be "closer to 50%" than a percentage of 35%. We do not understand how the court can base a finding of monopoly power on such an equivocal statement.

The statement of Max Bailey can be read, and is to be read, most favorably to the plaintiffs. On such a reading, Max Bailey's assertions could be interpreted to mean that Allgas maintained approximately 50% of the residential market in its Altoona district.

The defendants contend that Gunther is unqualified to testify because he has never before testified in a Robinson-Patman Act case. Categorically, were this a sufficient reason for disqualification, all experts would be disqualified in all of their first cases and in any subsequent cases, because those cases would be first cases due to prior exclusion. The defendants' contention, yielding such a result, is apparently inappropriate.

Next, the defendants argue that Gunther conducted no analysis of the relevant market. The plaintiffs dispute this, stating that Gunther reviewed census information and information obtained from the Internet, reviewed sales reports and other documents of Allgas and confirmed his opinions by speaking with an individual with the National Propane Association. Perhaps the plaintiffs' expert is weak on this aspect of his testimony. So is the defendants' expert. But these are weaknesses to be exposed at trial, not in a dispute over admissibility.

Finally, the defendants argue that Gunther's methodology is flawed and unreliable in that Gunther failed to consider the relevant factors in determining relevant market. Plaintiffs contest this, arguing that Gunther did, in fact, analyze all of the relevant factors. The factors over which the parties dispute are set out in T. Harris Young & Assoc. v. Marquette Elec., 931 F.2d 816, 823 (11th Cir. 1993) (emphasis added):

> The geographic dimension is the area in which the product or its reasonably interchangeable substitutes are traded. L.A. Draper & Son v. Wheelabrator- Frye, Inc., 735 F.2d 414, 423 (11th Cir.1984). Price data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors must be considered in determining the relevant geographic market. Id. A geographic market is only relevant for monopoly purposes where these factors show that consumers within the geographic area cannot realistically turn to outside sellers should prices rise within the defined area. Id. at 424.

In L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 423 (11th Cir. 1984) (emphasis added), the Eleventh Circuit Court of Appeals stated:

> In determining the "area of effective competition" in which a product or its reasonably interchangeable substitutes are traded, "such economic and physical barriers to expansion as transportation costs, delivery limitations and customer convenience and preference must be considered." Hornsby Oil Co. v. Champion Sparkplug Co., 714 F.2d at 1394. The location and facilities of other producers and distributors are also essential in determining the relevant geographic market. See Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327 [] (1961). Economically significant geographic barriers limit the ability of sellers outside the market to operate within, and the ability of purchasers to obtain the product from suppliers outside the geographic area. Id. Price data, corroborated by the factors listed above, are perhaps the most probative evidence on the relevance of the given market.
>
> > If sellers within the area are making price and output decisions protected from the need to take account of sellers outside the area, there is the distinct [geographic]

> market. If sellers within the market must take account of sellers outside it, either
> because those sellers are mobile and can easily come into the area to sell, or because
> buyers are mobile and can easily go outside the area to buy, the market is being
> defined too narrowly.

L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST, § 19 at 68 (1977).  See also II P.
AREEDA & D. TURNER, ANTITRUST LAW, ¶ 522 at 355 ("[w]hen prices and price
movements in two territories are closely corrollated, a single market definition is strongly
indicated").

One thing that is readily apparent from the discussion of relevant geographic markets is that the
geographic market must be relevant to some aspect of the plaintiffs' case.  There is no such thing as
a general relevant geographic market.  A geographic market can be relevant to the area in which
competitors were subject to predatory pricing or to the area in which recoupment was to occur or
monopoly power was to be exercised.  The construction of a relevant geographic market must be
done with its purpose in mind.

On a motion for summary judgment, the court must assess the proof to ascertain whether
there is a genuine need for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986).  Summary judgment is appropriate only if this court concludes that no genuine issue of
material fact exists and that the moving party is entitled to judgment as a matter of law.  FED. R.
CIV. P. 56(c).  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v.
Catrett, 477 U.S. 317, 322 (1986).

The defendants apparently maintain that the entire burden rests on the plaintiffs in a
motion for summary judgment.  However, "under Rule 56(c), a party moving for summary
judgment always bears the burden of demonstrating the absence of a genuine issue as to a material
fact."  Carver v. Bunch, 946 F.2d 451, 454 (6th Cir. 1991); see Celotex, 477 U.S. at 323.  A party
seeking summary judgment bears the initial responsibility of informing this court of the grounds for
its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories,
admissions on file, and any affidavits that it believes prove the absence of a genuine issue of
material fact.  Id.

> The movant's burden is "only [to] point out the absence of evidence supporting the
> nonmoving party's case."  Skotak, 953 F.2d at 913 (quoting Latimer v. Smithkline & French
> Laboratories, 919 F.2d 301, 303 (5th Cir.1990)).  "If the moving party fails to meet this
> initial burden, the motion must be denied, regardless of the nonmovant's response. . . ."

Stults v. Conoco, Inc., 76 F.3d 651, 656 (5th Cir. 1996).  Despite the ease for the movant of
satisfying the initial burden, "conclusory assertions to aver the absence of evidence remain

insufficient to meet this burden.  Otherwise, as Justice Brennan cautioned, summary judgment '[would] be converted into a tool for harassment.'" <u>Windon Third Oil & Gas Drilling Partnership v. Federal Deposit Ins. Corp.</u>, 805 F.2d 342, 345-46 n. 7 (10th Cir. 1986) (quoting <u>Celotex</u>, 106 S.Ct. at 2554 (Brennan, J. dissenting)).

> To prove that no genuine factual issues exist, a movant must present a factual scenario without any "unexplained gaps." <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158 [] (1970); <u>accord</u> <u>O'Donnell</u>, 891 F.2d at 1082. Where the movant is the defendant, or the party without the burden on the underlying claim, the movant has no obligation to produce evidence negating its opponent's case. The moving party merely has to point to the lack of any evidence supporting the non-movant's claim. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-25 [] (1986).

<u>National State Bank v. Federal Reserve Bank of New York</u>, 979 F.2d 1579, 1581-82 (3d Cir. 1992). The defendant, in averring the absence of a genuine issue of material fact, must articulate its contention with enough specificity that the plaintiff can identify the concerns of the defendant about the plaintiff's case and respond to the those concerns with specific legal argument and particular allusions to the evidence, given the evidence exists. Just as the court is not required to sift through a mountain of evidence and argument to discover for the plaintiff his claim, the court will not attempt to read a specific argument into general or undeveloped accusations that the plaintiff has failed to state some aspect of his claim.[12]

Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." <u>Cottle v. Storer Communication, Inc.</u>, 849 F.2d 570, 575 (11th Cir. 1988).

> An issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 [] (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 [] (1986).

<u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998 (11th Cir. 1992). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing the presence of a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324. The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . .

---

[12]  In short, both plaintiffs and defendants are to exercise three practical virtues in brief writing — clarity, specificity and simplicity.

. " in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c). In resolving whether a given factual dispute requires submission to a jury, the court must view the presented evidence through the prism of the substantive evidentiary burden. Anderson, 477 U.S. at 254-55.

In antitrust cases, a plaintiff will not be entitled to pass summary judgment if the "claim is one that simply makes no economic sense" and the plaintiff cannot "come forward with more persuasive evidence to support its claim. . ." Matsushita, 475 U.S. at 587. This does not impose an added burden on the plaintiff, however:

> The Court's requirement in Matsushita that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enunciates any economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. Matsushita demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision. If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.

Eastman Kodak Co. v. Image Technical Serv., Inc., 504 U.S. 451, 468-69 (1992).

In evaluating the contentions of the parties, the court must avoid weighing conflicting evidence for probity or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). Considering the above, this court must examine the evidence to determine the existence of genuine issues of material fact as to the various issues.

The court calls special attention to the initial Celotex burden of the defendants in this case on the issue of relevant geographic market. On the issue of relevant geographic market, the court is uncertain whether the defendants' scepticism about plaintiffs' ability to prove a relevant geographic market either raises an issue material to the plaintiffs' case or articulates a problem with enough specificity to enable the plaintiffs to competently respond. The court notes that the defendants did not raise their "relevant geographic market" contentions in their initial motion for summary judgment or the brief filed with that motion. Throughout the defendants' brief, the plaintiffs' description of relevant markets remains uncontested, to the degree they are perceived. Instead, the issue was raised by the defendants in their motion to strike Gunther's report and in their reply brief in support of the motion for summary judgment.

The defendants state that their reason for not advancing the "relevant geographic market" concern in their initial brief was that they had accepted the plaintiffs' earlier definition of that

market as the regions of Etowah, Blount and Marshall counties. The defendants contend that only
after the plaintiffs had allegedly altered their definition of the relevant geographic market did they
chose to address the relevant geographic market issue. A glance at the defendants' initial brief
shows this to be incorrect. The defendants acknowledge in that brief that "Bailey's Propane Gas
intended to service principally Blount County and parts of Etowah and Marshall counties."
Defendants' Brief in Support of the Motion for Summary Judgment at 4-5 (citing to Plaintiffs'
Response to Defendants' First Set of Interrogatories). The area stated by the defendants as the
geographic market in which Bailey Gas operated is roughly the same as that demarcated by the
plaintiffs' allegation that the market in which they operated was within a twenty mile radius of Susan
Moore.[13]

The plaintiffs argue four bases for liability against the defendants. The plaintiffs first
contend that the defendants engaged in anti-competitive activity in violation of § 2(a) of the
Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), which reads:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce,
> directly or indirectly, to discriminate in price between different purchasers of commodities
> of like grade and quality, where either or any of the purchases involved in such
> discrimination are in commerce, where such commodities are sold for use, resale or
> consumption . . . and where the effect of such discrimination may be to substantially lessen
> competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or
> prevent competition with any person who either grants or knowingly receives the benefit of
> such discrimination, or with customers of either of them [. . .].

Section 13(a) was originally enacted in 1914 as § 2(a) of the Clayton Act. As originally enacted, the
section was meant to prohibit primary-line injuries to competition. A primary-line injury to
competition occurs when one seller of goods injures competition by discriminating in the pricing of
goods among its purchasers such as to limit other competitors' opportunity or ability to compete.
"The section, when originally enacted . . . was born of a desire of Congress to curb the use by
financially powerful corporations of <u>localized price-cutting</u> tactics which had gravely impaired the
competitive position of sellers." <u>Federal Trade Comm. v. Anheuser-Busch, Inc.</u>, 363 U.S. 536, 542
(1960)(emphasis added). In 1936, this section of the Clayton Act was amended by the Robinson-
Patman Act to prohibit secondary-line injuries to competition, those injuries to competition
occurring when a seller discriminates among competing buyers. As the Supreme Court has noted,

---

[13] Exhibit A attached by the defendants in their reply to this court's proposed order demonstrates exactly this
point.

the amendments made by the Robinson-Patman Act did not upset the right of a seller to bring an action against a competing seller for a primary-line injury. Id.

> Respecting primary-line injury, the most notable difference between the Robinson-Patman Act and the Sherman Act is the former statute's much more liberal injury requirement. While the Sherman Act reaches only "monopolization," "attempt," or "conspiracy" to monopolize, the Robinson-Patman Act reaches qualifying pricing decisions "where the effect . . . may be substantially to lessen competition or tend to create a monopoly. . . ."
>
> The difference between the Sherman Act and the Robinson-Patman Act is not, therefore, that the Sherman Act requires one price-cost test for determining injury to competition while the Robinson-Patman Act requires a different test. If the Sherman Act test, which is created by courts and not be the language of that statute, is correctly defined to identify competitive injury, then the same price-cost test applies under the Robinson-Patman Act. Likewise, the statutes both make the same assumptions about underlying rationality: Predatory pricing is not a rational activity unless it promises post-predation recoupment sufficient to pay its costs plus produce a profit.
>
> Rather, the difference between the two statutes lies in the way they measure competitive injury. The Sherman Act reaches unilateral pricing conduct only when it "monopolizes" or threatens to create a monopoly. By contrast, the Robinson-Patman Act reaches similar conduct when it threatens "substantially to lessen competition." This "lessen competition" requirement permits the Robinson-Patman Act to be used to reach oligopoly falling short of monopoly.

PHILLIP E. AREEDA, ET AL., 2A ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 745e (1996) (footnotes omitted).

In earlier cases, a plaintiff could show a primary-line injury under § 13(a) if it could establish that the competitor discriminated in pricing its output while engaged in interstate commerce and that the discrimination caused an injury to competition. Henry v. Chloride, Inc., 809 F.2d 1334, 1337 (8th Cir. 1987). See also Lipson v. Socony Vacuum Corp., 87 F.2d 265, 269 (1st Cir. 1937), cert. granted, 300 U.S. 651 (1937), dismissed as per stipulation of dismissal, 301 U.S. 711 (1937). The defendants here do not raise significant issue as to the whether any alleged discrimination, if it occurred, occurred in the course of interstate commerce. Prior to the Supreme Court's decision in Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993), a plaintiff could demonstrate an injury to competition either through a strict market analysis or by demonstrating that the defendant engaged in predatory pricing. Lomar Wholesale Grocery, Inc., v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 596 (8th Cir. 1987); International Air Industries v. American Excelsior Co., 517 F.2d 714, 722 & n.14 (5th Cir. 1975).

Brooke Group substantially changed the playing field. The court initially notes the not so edifying negative comment in Brooke Group Ltd. regarding Robinson-Patman Act predatory

pricing claims:[14]

> "[T]he mechanism by which a firm engages in predatory pricing — lowering prices — is the same mechanism by which a firm stimulates competition; because 'cutting prices in order to increase business often is the very essence of competition. . .[;] mistaken inferences. . .are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" Cargill, supra, at 122, n. 17 (quoting Matsushita, supra, at 594). It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high.

Id. at 226-27.[15] More concrete statements in Brooke Group include the following:

> By its terms, the Robinson-Patman Act condemns price discrimination only to the extent that it threatens to injure competition.

Id. at 220.

> There are, to be sure, differences between the two statutes. For example, we interpret § 2 of the Sherman Act to condemn predatory pricing when it poses "a dangerous probability of actual monopolization," Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 455 (1993), whereas the Robinson-Patman Act requires only that there be "a reasonable possibility" of substantial injury to competition before its protections are triggered, Falls City Industries, Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 434 (1983). But whatever additional flexibility the Robinson-Patman Act standard may imply, the essence of the claim under either statute is the same: A business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market.
>
> Accordingly, whether the claim alleges predatory pricing under § 2 of the Sherman Act or primary-line price discrimination under the Robinson-Patman Act, two prerequisites to recovery remain the same. First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs.

Id. at 222.

> The second prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices.

---

[14] Brooke Group addressed a claim of "price discrimination that had a reasonable possibility of injuring competition in violation of § 2(a) of the Clayton Act, as amended by the Robinson Patman Act, 490 Stat. 1526, 15 U.S.C. § 13(a)]" Id., 216-17. That is the same type "primary line" price discrimination claim as made by these plaintiffs.

[15] In Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 589 (1986), the Court stated that "predatory pricing schemes are rarely tried; and even more rarely successful." Again, this general comment is not of much help to the trial courts other than to suggest that plaintiffs have a strong burden of proof. In 62 Antitrust Law Journal 605, the writer states that Brooke Group "may have brought . . . to a close . . . all predatory pricing claims." The writer also suggests that the plaintiff in Brooke Group had "unusually strong evidence on its side," yet the Court held that the evidence was insufficient to uphold a jury verdict. The writer further stated "plaintiffs suing defendants with much higher market shares, even dominant-firm market shares, will be hard pressed to match the quality of Liggett's evidence . . . ." Further, "predatory pricing will be virtually a dead letter in federal antitrust cases."

See Matsushita, supra, at 119, n. 15. "For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered."

Id. at 224.

That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured: It is axiomatic that the antitrust laws were passed for "the protection of competition, not competitors." Brown Shoe Co. V. United States, 370 U.S. 294, 320 (1962). Earlier this Term, we held in the Sherman Act § 2 context that it was not enough to inquire "whether the defendant has engaged in 'unfair' or 'predatory' tactics"; rather, we insisted that the plaintiff prove "a dangerous probability that [the defendant] would monopolize a particular market." Spectrum Sports, 506 U.S. at 459. Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or "purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." Hunt v. Crumboch, 325 U.S. 821, 826 (1945).

For recoupment to occur, below-cost pricing must be capable, as a threshold matter, of producing the intended effects on the firm's rivals, whether driving them from the market, or, as was alleged to be the goal here, causing them to raise their prices to supra competitive levels within a disciplined oligopoly. This requires an understanding of the extent and duration of the alleged predation, the relative financial strength of the predator and its intended victim, and their respective incentives and will. See 3 Areeda & Turner ¶ 711b. The inquiry is whether, given the aggregate losses caused by the below-cost pricing, the intended target would likely succumb.

If circumstances indicate that below-cost pricing could likely produce its intended effect on the target, there is still the further question whether it would likely injure competition in the relevant market. The plaintiff must demonstrate that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it. As we have observed on a prior occasion, "[i]n order to recoup their losses, [predators] must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess, profits what they earlier gave up in below-cost prices." Matsushita, 475 U.S., at 590-591.

Evidence of below-cost pricing is not alone sufficient to permit an inference of probable recoupment and injury to competition. Determining whether recoupment of predatory losses is likely requires an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market.

Id. at 224-226 (emphasis added).[16]

---

[16]This court notes a possible distinction between this case and the Brooke Group case. In the Brooke Group case, Liggett did not "allege that Brown and Williamson sought to drive it from the market, but that Brown and Williamson sought to preserve supra competitive profits on branded cigarettes by pressuring Liggett to raise its generic cigarette prices through a process of tacit collusion with the other cigarette companies." Id. 227. There is no reasonable inference in this case that the defendants have colluded with other oligopolistic suppliers. There may be a

> In certain situations--for example, where the market is highly diffuse and competitive, or where new entry is easy, or the defendant lacks adequate excess capacity to absorb the market shares of his rivals and cannot quickly create or purchase new capacity--summary disposition of the case is appropriate. See, e.g., Cargill, 479 U.S. at 119-120, n. 15.

Id. at 226.

> In Matsushita, we remarked upon the general implausibility of predatory pricing. See 475 U.S., at 588-590. Matsushita observed that such schemes are even more improbable when they require coordinated action among several firms. Id. At 590. Matsushita involved an allegation of an express conspiracy to engage in predatory pricing. The Court noted that in addition to the usual difficulties that face a single firm attempting to recoup predatory losses, other problems render a conspiracy "incalculably more difficult to execute." Ibid. In order to succeed, the conspirators must agree on how to allocate present losses and future gains among the firms involved, and each firm must resist powerful incentives to cheat on whatever agreement is reached. Ibid.

Id. at 227.

> Yet on the whole, tacit cooperation among oligopolists must be considered the least likely means of recouping predatory losses.

Id. at 228.

> We decline to create a per se rule of nonliability for predatory price discrimination when recoupment is alleged to take place through supra competitive oligopoly pricing. Cf. Cargill, 479 U.S., at 121.

Id. at 230.

> Liggett has failed to demonstrate competitive injury as a matter of law, however, because its proof is flawed in a critical respect: The evidence is inadequate to show that in pursuing this scheme, Brown & Williamson had a reasonable prospect of recovering its losses from below-cost pricing through slowing the growth of generics. As we have noted, "[t]he success of any predatory scheme depends on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." Matsushita, 475 U.S., at 589 (emphasis omitted).

Id. at 231-232.

> Because relying on tacit coordination among oligopolists as a means of recouping losses from predatory pricing is "highly speculative," AREEDA & HOVENKAMP ¶711.2c, at 647, competent evidence is necessary to allow a reasonable inference that it poses an authentic threat to competition. The evidence in this case is insufficient to demonstrate the danger of Brown & Williamson's alleged scheme.

Id. at 232.

> To be sure, Liggett's economic expert explained Liggett's theory of predatory price discrimination and testified that he believed it created a reasonable possibility that Brown & Williamson could injure competition in the United States cigarette market as a whole. App.

---

reasonable inference that the defendants sought to drive the plaintiffs from the market.

600-614. But this does not alter our analysis. When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. Cf. J. Truett Payne Co., Inc., 451 U.S., at 564-565 (referring to expert economic testimony not based on "documentary evidence as to the effect of the discrimination on retail prices" as "weak" at best). Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them. As we observed in Matsushita, "expert opinion evidence . . . has little probative value in comparison with the economic factors" that may dictate a particular conclusion. 475 U.S., at 594, n. 19.

Id. at 242.

We hold that the evidence cannot support a finding that Brown & Williamson's alleged scheme was likely to result in oligopolistic price coordination and sustained supra competitive pricing in the generic segment of the national cigarette market. Without this, Brown & Williamson had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition the antitrust laws prohibit.

Id. at 243.

In Brooke Group, the Supreme Court stated that a plaintiff can only show injury to competition through a predatory pricing scheme if the defendant (1) sold its output below an appropriate measure of cost and (2) could reasonably be expected to recoup its investment in below-cost pricing. Brooke Group, 509 U.S. at 224-26. The defendants contend that the plaintiffs meet neither of these requirements.

Both the plaintiffs and defendants agree on the legal standard to be employed in demonstrating that Allgas sold propane below the appropriate measure of cost. In McGehee v. Northern Propane Gas Co., 858 F.2d 1487, 1503-04 (11th Cir. 1988), the Eleventh Circuit Court of Appeals stated that, where the defendant prices below short-run marginal cost, the burden is on the defendant to demonstrate that it did not have predatory intent. Where, however, the defendant prices below average total cost but above short-run marginal cost, the plaintiff "must have evidence, either objective or subjective, of predatory intent." Id. at 1503.[17]

The defendants argue that the plaintiffs cannot demonstrate that prices fell below average variable costs during the alleged predatory period. The plaintiffs respond that during two months of the alleged predatory pricing period, April and June of 1995, Allgas priced below its average variable cost to sell the propane. The defendants respond that the plaintiffs can only claim that the alleged predatory pricing period lasted until December of 1994, when Allgas began to raise its prices

---

[17] Since Brooke Group did not decide the issue of how below cost pricing is to be determined, Eleventh Circuit law controls. On the other hand, after Brooke Group, predatory intent may not be as significant as before.

and that prices fell below average variable costs during those months due to seasonal fluctuations in demand for propane gas.

Average variable cost, average fixed cost, average total cost and marginal cost are all related terms and can easily be conflated.[18] The average total cost to produce a quantity of goods is the sum of the average fixed cost and average variable cost to produce that quantity of goods, including profits. See McGahee, 858 F.2d at 1503.[19] The fixed cost (also called a constant, or non-operating, cost) of producing a good is the sum of those costs, such as rent, fixed salaries, cost of equipment and the like, which will not vary with the production of a greater or lesser amount of the good. Average fixed cost is the fixed cost divided by the quantity of goods produced. The variable, or operating, cost is that cost that goes directly into the production and bringing to market of the total quantity of the good, such as commissions, inputs costs, delivery costs &c.. Average variable cost is an average of the variable cost of producing a particular good over the quantity of that good produced. When goods are priced such that no quantity can be produced at above the average variable cost (the breakeven point), it is more efficient for the producer of the good to shut down.[20] In contrast to the variable cost, the marginal cost is the cost of producing each additional unit of output. As a normal matter, the costs that go into calculating variable cost are the same as those that go into calculating marginal costs. However, there is a key difference. The marginal cost, at any given quantity, is the cost of producing that particular additional output; the average variable cost is, generally, the average of marginal costs of each unit of output up to and including the newest unit of output.

In Table 1 and Figure 1 below, the relations between average fixed cost, average variable cost, marginal cost and average total cost are illustrated. Assume the existence of a widget-maker who has the choice of producing between 0 and 10 widgets. The widget-maker chooses to manufacture and sell four widgets. His cost for the capacity to make those four widgets, regardless of whether any widgets are actually produced (his fixed cost), is $10. For four widgets, his average

---

[18] Unless otherwise stated, terms in this discussion refer to short-term costs.

[19] They can also be calculated with reference to long-term marginal costs.

[20] The reason for this is relatively simple. No matter how much (or little) the producer makes, its fixed costs will remain the same. Where the price is such that it is below the variable costs, the producer is actually increasing its debt (above the fixed costs) by producing any further output. On the other hand, where the producer shuts down, its variable costs are reduced to zero. The producer's only costs are fixed costs, which may also be reduced or eliminated.

fixed cost is therefore $2.50. To produce each widget, it costs the widget-maker a variable amount

**Table 1 — Various Costs Calculated by quantity of Widgets Produced**

| Quantity | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg. Fixed Cost | $10 | $10 | $5 | $3.33 | $2.50 | $2 | $1.67 | $1.43 | $1.25 | $1.11 | $1 |
| Marginal Cost | $0 | $10 | $8 | $7 | $6 | $5 | $4 | $6 | $8 | $10 | $13 |
| Avg. Var. Cost | $0 | $10 | $9 | $8.33 | $7.25 | $7.2 | $6.67 | $6.57 | $6.75 | $7.11 | $7.70 |
| Avg. Total Cost | $10 | $20 | $14 | $11.67 | $9.75 | $9.2 | $8.33 | $8.00 | $8.00 | $8.22 | $8.70 |

in input cost, delivery cost, hourly labor &c. Table 1 and Figure 1 illustrate the cost of producing each next widget as the marginal cost. In the illustrations, the marginal costs decrease initially to reflect diminishing input costs and delivery costs resulting from inputs being bought in less expensive bulks and conservation of delivery costs among customers. The illustrations also point out a raise in marginal cost at production of seven or greater widgets. This reflects the impact of the law of diminishing returns on variable cost.[21] For the widget-maker, the cause of the diminishing returns at production of the seventh widget can be reflected in increased breakdown of the production equipment and additional time that the sellers of the widgets are required to invest in finding buyers for the widgets. An increase in the marginal cost curve illustrated in Figure 1 is not in practice mandated, however, as a



**Figure 1**

---

[21] The law of diminishing returns holds that as more units of output are produced, the cost to produce each additional unit of output will rise as production capacity becomes stretched and it becomes more costly to develop and bring to market.

market participant may be organized such that it has within the maximal number of units it could practically sell an ever-decreasing marginal cost.[22] For the widget-maker, his marginal cost at producing the fourth widget is $6, better than the third widget, but not quite as good as if he produced a fifth widget. His average variable cost ($7.25) is the sum of his marginal costs ($10 + $8 + $7 + $6 = $31) divided by the quantity of widgets produced (4). His average total cost (short-run), $9.75, is the sum of his average variable cost and average fixed cost. Note that while the average variable cost will always be below the total cost of producing a quantity of goods, <u>the marginal cost of producing additional units of output may exceed the total cost of producing that quantity.</u>

Although relevant for whether Allgas could recoup its investment in alleged predation, at this point in the analysis, it is irrelevant whether Allgas was a price taker — one who commands such a small portion of the market that it is irrelevant to the demand curve how its sets prices — or a price searcher — one whose price does depend upon the quantity of output offered. All that the court is presently required to determine is whether Allgas priced below an appropriate level of cost. In <u>McGehee</u>, the Eleventh Circuit articulated a two-tier burden-shifting test for the determination of whether a defendant in a Robinson-Patman Act case engaged in predatory pricing:

> If a defendant's prices were above average total cost then there is no predatory pricing and thus no circumstantial evidence of predatory intent. Average total cost means the average of the total economic cost, which includes the necessary minimum profit. Average total cost should theoretically be measured by long run marginal cost, but in appropriate cases a surrogate for total cost may be used.
>
> If a defendant's prices were below average total cost and above short run marginal cost, then there is circumstantial evidence of predatory intent. An inference of predatory intent, however, may not rest solely on prices of this nature. To withstand judgment as a matter of law, a plaintiff must have other evidence, either objective or subjective, of predatory intent. <u>See</u> <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 [] (1986) (antitrust plaintiff must present evidence that tends to exclude the possibility that defendant's conduct was as consistent with permissible competition as with illegal conduct). The closer a defendant's price is to average total cost, the stronger this other evidence must be for the plaintiff still to avoid summary judgment. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 [] (1986) ("[t]he moving party is 'entitled to judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof"). As suggested by Areeda and Turner, average variable cost may usually be used as a surrogate for short run marginal cost.
>
> If a defendant's prices were below short run marginal cost, then the circumstantial

---

[22] This might occur, for example, where the seller does not manufacture the goods and where the consumers desire the good as a necessity.

> evidence is strong enough to create a rebuttable presumption of predatory intent. See Matsushita, 106 S.Ct. at 1357 (antitrust plaintiff must present evidence that tends to exclude the possibility that defendant's conduct was as consistent with permissible competition as with illegal conduct); Standard Oil Co. v. United States, 221 U.S. 1, 52 [] (1910) (summarizing the common law, from which the Sherman Act borrowed, as recognizing presumptions created by objective evidence); cf. Fed.R.Evid. 301 (presumptions in general in civil actions). . . . Again, average variable cost may be used as a surrogate for short run marginal cost.

McGehee v. Northern Propane Gas Co., 858 F.2d at 1503-04 (footnotes omitted). Presumably, if marginal costs exceed total costs, sales of a quantity at below total cost will defacto be below marginal costs. However, this will not of necessity demonstrate gross inefficiency on the part of the alleged predator if that predator is still pricing between its average variable costs and its total costs. At that point it is still recovering its variable costs and (possibly) covering at least some of its short-term fixed costs.[23] If the defendant sells a quantity of goods at a point where marginal cost exceeds average total cost, the burden to explain the pricing will shift to the defendant only if the pricing was below average variable cost. However, given the probable proximity of the average total cost and the average variable cost at that point, the defendant is required to demonstrate that pricing below average total cost was above average variable cost.

Table 2, below, sets out the prices charged by Allgas, its average variable cost, its average fixed cost and its average total cost for each month in question, calculated on the basis of figures supplied by Allgas and calculations made by the defendants' expert, Robert McLeod.[24]

---

[23] However, the larger the quantity the predator produces, the more unlikely it becomes that pricing below total cost is not also pricing below average variable cost. Calculating the average variable cost can be done by taking the short-term average total cost and subtracting the average fixed cost at any point. As the quantity of output produced increases, the average fixed cost grows less, i.e.

$$\lim_{q \to \infty} \frac{fc}{q} = 0,$$

where $fc$ is the fixed cost and $q$ is the quantity of output. Consequently, the gap between short-term average total cost and average variable cost closes, making it more likely that prices set below average total cost will also be below average variable cost at high quantities of output.

[24] The prices stated in the price column were taken from Defendants' Reply Addendum of Evidence, Exhibit N, Stated Price Per Gallon at 1. The prices in the exhibit are those that Allgas avers that it charged in the residential market for the time frame at issue. This price at times differs from the average price charged by Allgas stated in McLeod's report — in the early months, average price calculated by McLeod exceeds the residential price stated in the residential gas price exhibit, but in later months, the figures in McLeod's report are lower than those in the residential gas price exhibit. Presumably, the variations are due to the difference between the price charged commercial customers and that charged residential customers. Average variable cost might vary as well, but as the defendants' have presented no other data upon which to base average variable and fixed costs, the court will accept the figures presented as the average variable cost of producing and bringing to market the quantity sold.

TABLE 2 — ALLGAS' PRICES AND COSTS FROM SEPTEMBER 1994- JULY 1995, BY MONTH

| Month | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Price | $.50 | $.50 | $.50 | $.50 | $.675 | $.725 | $.75 | $.75 | $.75 | $.775 | $.80 |
| AVC | $.45 | $.46 | $.51 | $.50 | $.45 | $.47 | $.47 | $.51 | $.46 | $.59 | $.38 |
| AFC | $.027 | $.06 | $.06 | $.026 | $.025 | $.024 | $.049 | $.111 | $.148 | $.187 | $.375 |
| ATC (ST) | $.477 | $.52 | $.57 | $.526 | $.475 | $.494 | $.539 | $.621 | $.628 | $.777 | $.755 |

As Figure 2 illustrates, Allgas's price dipped below its total costs beginning between September and October and continuing through December and dipped again in June.  In November and December, prices dipped below average variable cost.[25]  On an analysis based upon pricing below



**Figure 2**

total costs, the plaintiffs have created a genuine issue of material fact.  They have not only

---

[25] McLeod's report also indicates that the price dipped below the average variable cost in April and June of 1995.  The defendants contend that this dip was due to a seasonal decrease in demand and that it could not have received above its average variable cost.  The court will not address this argument and defendants' contention that Bailey Gas was already gone from the market by that point, however, because sufficient evidence of predatory pricing by Allgas during the September-December 1994 period exists to pass summary judgment analyis.

demonstrated pricing below costs, but have also pointed to comments of William Erwin, the general manager of Allgas, which could lead a trier of fact to conclude that Allgas's intent in cutting its prices was to eliminate Bailey Gas and keep prices at the pre-existing levels. In addition, in the months of November and December, the price charged by Allgas fell below average variable costs, a permissible proxy for short-run marginal costs, shifting the burden of explanation onto the defendants.[26]

The defendants' next contention is that the plaintiffs are unable to show the potential for recoupment. In Brooke Group, the Supreme Court stated:

> For recoupment to occur, below-cost pricing must be capable, as a threshold matter, of producing the intended effects on the firm's rivals, whether driving them from the market, or, as was alleged to be the goal here, causing them to raise their prices to supracompetitive levels within a disciplined oligopoly. This requires an understanding of the extent and duration of the alleged predation, the relative financial strength of the predator and its intended victim, and their respective incentives and will. See 3 AREEDA & TURNER ¶ 711b. The inquiry is whether, given the aggregate losses caused by the below-cost pricing, the intended target would likely succumb.

Brooke Group, 509 U.S. at 225 (emphasis added). Satisfying this threshold requirement alone is not sufficient, "there is still the further question whether it would likely injure competition in the relevant market." Id; See also Rebel Oil Company v. Atlantic Richfield Co., 51 F.3d 1421, 1447 (9th Cir. 1995) ("To show a lessening of competition, it is not enough to show that the number of rivals has been reduced or that the market is concentrated.").

The plaintiff must demonstrate that there is a likelihood that the predatory scheme alleged

---

[26] The defendants may, in fact, have an easier time attempting to demonstrate that the pricing below average variable costs was not, in fact predatory than would appear to be the case from the table and chart above. A look over the data provided by the defendants would indicate that Allgas has, on any given month, a declining average variable cost curve and, as a result, a declining marginal cost curve. Examining the data provided by the plaintiffs and defendants as to Allgas's sales, it appears that, disregarding the cost of the gas to Allgas, Allgas's variable costs generally decreased as more gallons of the gas were sold. Being a purchaser of the gas, it is probably the case that Allgas's costs either remained the same with a purchase of increased quantity or that those costs decreased. Adding the curve representing the cost of the gas itself yields a downward average variable cost curve and a marginal cost curve that is lower than the average variable cost curve. (The area under the marginal cost curve at any given point $(x, z)$ is equal to the area of the rectangle formed by a line drawn from $(x, 0)$ to the average variable cost curve and from there to the y-axis. Because this area, on a decreasing average variable cost curve, is less than the area under the average variable cost curve itself, the marginal cost curve must remain below the average variable cost curve.) If the curve were to continue downward, that Allgas priced below its costs could be mere happenstance. Were Allgas to have sold a greater quantity, its price for that quantity may have exceeded its average variable costs and even its total costs. If Allgas had the intent to increase its share of the market by lowering its prices, expecting the expanding quantity of sales to dissolve the loss it would incur selling at its present quantity, the decision made was not a calculated predatory cost-cutting, but a rational and efficient cost lowering strategy that failed, either due to a warm winter or inflexibility among consumers. However, because this is a matter of factual contingency rather than economic necessity, summary judgment will not be granted on this basis.

would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it. As we have observed on a prior occasion, "[i]n order to recoup their losses, [predators] must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below- cost prices." Matsushita, 475 U.S., at 590-591, 106 S.Ct., at 1358.

Brooke Group, 509 U.S. at 225-26.

The above could be taken in two ways: First, the language indicating a threshold requirement could reasonably be taken to limit the plaintiffs' burden on summary judgment to merely showing a likelihood of the harms stated. Further demonstration of recoupment would be required at trial. The plaintiffs seem to argue for this understanding in their brief.

The second way in which the language could be taken is to require plaintiffs to show both likely injury and a likelihood of a rise in (or maintenance of) supracompetitive prices. Despite the difficulty to a plaintiff of showing both on a motion for summary judgment, the court believes this to be the proper standard. The following language in Brooke Group leads the court to this result:

> Determining whether recoupment of predatory losses is likely requires an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market. Cf., e.g., Elzinga & Mills, Testing for Predation: Is Recoupment Feasible?, 34 ANTITRUST BULL. 869 (1989) (constructing one possible model for evaluating recoupment). If market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed. In certain situations — for example, where the market is highly diffuse and competitive, or where new entry is easy, or the defendant lacks adequate excess capacity to absorb the market shares of his rivals and cannot quickly create or purchase new capacity--summary disposition of the case is appropriate. See, e.g., Cargill, 479 U.S., at 119-120, n. 15[].

Brooke Group, 509 U.S. at 226.

First, then, the plaintiff must show that the "below-cost pricing could likely produce its intended effect on the target." Id. at 225. This initial burden is a causal one: The plaintiff has to show that the below cost-pricing was likely to have an effect on the target. The plaintiffs have adduced evidence of a year-long predation period, during which time Allgas, a company with significantly more resources and broader market power, allegedly cut its prices such that customers within Allgas's delivery radius sought out propane from Allgas rather than from alternative suppliers, such as Bailey Gas. At the termination of the decreased pricing, Bailey Gas was no more. In fact, data provided by the defendants demonstrates that the relative shares of companies who had a considerable portion of their delivery radius co-extensive with the Allgas delivery radius suffered percentage losses of sales in comparison to Allgas.

Second, a plaintiff must show the likelihood of a rise in prices to a supracompetitive level or that the prices that the defendant sought (seeks) by predation to maintain were (are) supra-competitive.[27] The determinant of whether a defendant can raise prices to or maintain prices at a supracompetitive level is the market power of the defendants (and, possibly, its oligopolistic conspirators).[28] Market power depends upon a variety of factors, some of them under the control of the defendants and others largely out of their ability to influence. The most important factors that a court is to consider in determining the market power of a competitor are the market-delineators, those factors which determine the size and scope of the competitive market both in terms of product and geography.

A market is definable as a set (S) of products containing the defendant's product ($p_\delta$) and comparable products ($p_1 \ldots p_{\delta-1}, p_{\delta+1} \ldots p_n$). A product p can be defined as an output type of a particular market participant. A relevant geographic market ($S^* \subseteq S$) as used in antitrust law is generated through two considerations, functional equivalence between a $p_d$ and any $p_i \in S$ (the set containing all products) and accessibility of a product $p_i$ to a potential consumer of $p_\delta$. The functional equivalence of any product, $p_i$, to the defendant's product depends upon whether that other product can perform for a consumer essentially the same functions as the defendant's product, $p_\delta$.[29] The set (S') containing those products capable of acting as functional equivalents of the defendant's product (a defendant's product will always be a functional equivalent of itself) can be said to constitute the "product market" of the defendant's product.

"Geographic market" is similarly defined. The geographic market, in its broadest sense, is the set S" which contains as its members all products (whether or not of the same product market as the defendant's product) to which consumers of $p_\delta$ have access. Although this definition of

---

[27] Unless driving plaintiffs from the market is itself sufficient, another feasible means of demonstrating recoupment would be to demonstrate that the crowding out of competitors resulted in an inability or unwillingness of competitors who could sell the product at present below average market price from entering the market and bringing prices down. This could be considered another form of supracompetitive pricing, but it bases the level of normal, competitive pricing on a counterfactual that is extraordinarily difficult to prove. The plaintiffs suggest, at points, that their claim might be of this sort, but they never demonstrate that there were the competitors who were scared out of the propane market.

[28] The court finds no evidence of such an oligopolistic conspiracy.

[29] Functional equivalence determines the kinds of products that are permissible substitutes of the defendant's product $p_\delta$ in that the substitutes fulfill the same purposes or have the same causal roles with respect to satisfaction of other desires of the consumer. This notion can be contrasted with equivalent utility between products — that is, the equivalent value between two products, irrespective of whether the reason for valuation is similar.

geographic market may be of interest in determinations of the marginal utility of a product in comparison to other products accessible to that product's consumers, it is too broad a concept for use in antitrust analysis. The term "relevant geographic market" refers to those products that are part of the same product market of the defendant's product and that are accessible to the consumers of the defendant's product, i.e. S' ∩ S" → S*.[30]

In the present case, the defendants do not argue against the plaintiffs' description of the product market, propane gas.[31] Instead, the defendants contend that the plaintiffs' description of the relevant geographic market is flawed. The plaintiffs have urged that Allgas can successfully set supracompetitive prices with respect to its propane sold out of its Altoona District office and propane sold by Allgas through all of its district stores.

> In determining the "area of effective competition" in which a product or its reasonably interchangeable substitutes are traded, "such economic and physical barriers to expansion as transportation costs, delivery limitations and customer convenience and preference must be considered." Hornsby Oil Co. v. Champion Sparkplug Co., 714 F.2d at 1394. The location and facilities of other producers and distributors are also essential in determining the relevant geographic market. See Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327 [] (1961). Economically significant geographic barriers limit the ability of

---

[30] Note that this definition of what is commonly referred to as "relevant geographic market" renders the term "geographic" somewhat a misnomer. The locus of the analysis is placed upon accessibility, that is the ability of the consumer to obtain functionally equivalent products, rather than whether other competitors are located so close to the defendant to potentially upset any price-setting activity. This avoids the circularity apparent in the later conception of the phrase "relevant geographic market," i.e. that the power to set prices in the power to make profit-maximizing decisions with respect to a group of products in the area in which one can set price.. (There is another way of defining this in terms of an area in which one's pricing decisions will affect the pricing decisions of other competitors. Although this appears to be a viable strategy, it falters if the end result of one's analysis turns on the competitor's perception of the monopolist or oligopolist, not upon the customer's perception of the competitor. As a result, a competitor who shifts his prices down in response to a defendant's upward shift in prices, but whose products are not actually accessible to the defendant's customers will not actually be in the same "geographic" market as the defendant and will not affect his likely recoupment. By contrast, if the focus is upon the customer's perception of the competitor, it will be so on the basis of the consumer's valuation of the competitor's product as an (inferior, equivalent or superior) accessible functional equivalent of the defendant's product.)

As an example of the explicated meaning of relevant geographic market in terms of product accessibility, assume the existence of a local "academic" bookshop which seeks to choose a supracompetitive price. In determining whether such a decision to set supracompetitive prices is a rational one, a court must examine where consumers of the bookshop could turn to obtain functionally equivalent products. Customers of the bookshop will have access not only to the other "academic" bookshops to which they could walk or drive without exceeding the cost to them of the books at the local bookshop, but also to such alternatives as internet bookstores and mail-order bookstores, neither of which exist in any specific place. Thus, the local bookseller may be the only bookseller within a reasonable driving distance, but his attempts at supracompetitive price setting could likely fail because of accessible, although not place specific, alternatives.

[31] Although wood and electricity would appear to be functional equivalents of propane gas, the plaintiffs contention that refitting for these substitutes renders them unlikely equivalents apparently goes unchallenged by the defendants.

sellers outside the market to operate within, and the ability of purchasers to obtain the product from suppliers outside the geographic area. Id. Price data, corroborated by the factors listed above, are perhaps the most probative evidence on the relevance of the given market.

> If sellers within the area are making price and output decisions protected from the need to take account of sellers outside the area, there is the distinct [geographic] market. If sellers within the market must take account of sellers outside it, either because those sellers are mobile and can easily come into the area to sell, or because buyers are mobile and can easily go outside the area to buy, the market is being defined too narrowly.

L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST, § 19 at 68 (1977). See also II P. AREEDA & D. TURNER, ANTITRUST LAW, ¶ 522 at 355 ("[w]hen prices and price movements in two territories are closely corrollated, a single market definition is strongly indicated").

L. A. Draper & Son v. Wheelabrator-Frye, 735 F.2d 414, 423 (11th Cir. 1984).

Allgas only delivered propane gas within a certain (twenty to twenty-five mile) radius from its Altoona district office. Residential buyers of propane do not travel to the sellers, but the other way around. Because of this, Allgas did not need to significantly concern itself with the possibility that customers of its product would drive outside of the delivery radius to procure propane gas. In that sense, at least, Allgas had a captive audience. Other propane gas retailers testified that when customers were located a significant distance from one of their storage facilities, the propane gas provider did not think of itself as being an alternative to other competitors selling propane gas in the area.

Each of Allgas's potential customers in the Altoona district had, depending upon that customer's geographic location within the district, access to alternative sources of propane gas. However, the geographic market does not, as defendants insist, consist in the sales areas of those competitors who sold to customers in the Altoona district in addition to the Altoona district itself. Allgas was not an accessible alternative source of propane gas to those consumers lying outside of the Altoona district and therefore could not rationally hope for recoupment in those areas. Therefore, the relevant geographic market contained as competing products from Amerigas, Country Gas, Dowdle Gas, Empire Gas, Ferrellgas, Jordan Gas and Southland Gas, to varying degrees, depending upon the number of Allgas's customers who had access to gas from these companies. Allgas attempts to calculate its market share based upon the entire sales of gas by each competitor which at least partially existed in the same relevant market as itself. However, this calculation is inappropriate, as for each competitor's product, propane gas from the Altoona district was not an accessible alternative for the entirety of its potential customers. Those excluded sales

could not have affected Allgas's market power among its potential customers and calculation of maximal price setting.

Having developed the relevant market in which Allgas allegedly participated, the court must determine whether a reasonable trier of fact could find that Allgas had the ability to set price. A market participant, such as the predator or the tacit oligopoly, who is in a highly diffuse and competitive market, or who is in a market with easy entry, or who does not have the ability to absorb the demands of a fallen competitor's customers does not have the power to exclude anyone from the market for a sufficient time to recoup the losses of predation. Brooke Group, 509 U.S. 226.[32]

As the Supreme Court has stated, as a matter of law, the plaintiffs cannot show that the defendants had the market power for recoupment "where the market is highly diffuse and competitive, or where new entry is easy, or the defendant lacks adequate excess capacity to absorb the market share of rivals." Id. The defendants claim that the plaintiffs cannot show that Allgas had the market power to recoup its losses by charging supracompetitive prices to its Altoona customers. The plaintiffs state that the 50 percent share of the residential market held by Allgas in the area served by the Altoona office is sufficient to show market power. The share of the market commanded by a competitor is not conclusive of the competitor's ability to set price, although it does aid in the demonstration of price-setting capacity. That Allgas did absorb the excess customers brought to it by its period of low pricing plausibly demonstrates that Allgas had the excess capacity to absorb any new customers. What the court must focus on is whether new entry into the market is easy.

Ease of entry into the market is governed by a number of "external" factors including loyalty of customers to competitors, necessary expertise, ability of competitors to recover sunk costs, etc. As the plaintiffs' expert has testified, with respect to the "external" factors, new competitors can enter the propane gas market with relative ease. However, the expert also considers other, "strategic" sources of barriers to market entry, such as the ability of a dominant competitor to dissuade future entry into the market through predation and shared foreknowledge that a dominant competitor will price out new competitors. Such a barrier is easy to explain: A dominant competitor that has sufficient reserves to engage in numerous predatory pricing schemes

---

[32] It is likely that the defendants had the ability to absorb any increased demand.

(without the need of instantaneous subsequent recoupment) can price out a few competitors in the market and appear willing to price out more. Future potential competitors, realizing this, will be hesitant to enter the market on the basis that they do not wish to become fodder for the dominant competitor's predation.[33] The plaintiff has presented some evidence of this type of behavior by Allgas. The plaintiffs have presented sufficient evidence that a reasonable trier of fact could find that Allgas drove Bailey Gas out of the market to keep prices from being pushed down and that other competitors either would not enter the market or would not reduce their prices such as to make Allgas's predation unprofitable. Allgas contends that its price cutting was taken in self-defense against perceived price cutting attempts by Bailey Gas. Whether this is the case is a factual matter, best decided by a jury at trial.

The court will not consider the further arguments of the parties on the worth of their respective experts. Each expert will have its say on the possibility of recoupment or lack thereof at trial. That genuine methodological disputes exist is sufficient to raise an issue or triable fact.

The defendants next dispute the plaintiffs' intentional interference with business relations claim. The Supreme Court of Alabama, in <u>Gross v. Lowder Realty Better Homes and Gardens</u>, 494 So.2d 590, 597 (Ala. 1986), that "tort of intentional interference with business or contractual relations, to be actionable, requires:

    (1) The existence of a contract or business relation;

    (2) Defendant's knowledge of the contract or business relation;

    (3) Intentional interference by the defendant with the contract or business relation;

    (4) Absence of justification for the defendant's interference; and

    (5) Damage to the plaintiff as a result of defendant's interference."

The defendants first argue that the plaintiffs cannot show the existence of a contract between themselves and their customers other than the contracts for "free" tank rental. However, the defendants contend, because the tank rental to the customers was free, the plaintiffs can assert no injury as a result of any competitive interference on the part of the defendants. The defendants' assertions are correct, as far as they go. The tank rental contracts between Bailey Gas and its

---

[33] Iterative game theoretic models demonstrate that predation can be, over a long period, a rational strategy. By dissuading future entrants into the market through fear of predation, the predator retains a higher degree of utility satisfaction than it would if it allowed entrants. See SCHERER AND ROSS, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE, 386-88; BAIRD, GERTNER & PICKER, GAME THEORY AND THE LAW, 178-86 (1994).

customers were for one year of free tank rental. However, as the plaintiffs point out, customers who rent tanks from a propane gas company are expected to purchase their gas from that company as long as they have the tanks. Thus, interference with the rental contracts may not have caused the plaintiffs damage in that they lost no income from tank rental fees, but damage may have been caused in that the plaintiffs did not obtain the propane gas sales connected to the rental of the tanks.[34]

The defendants also argue that they are justified in their interference. However, the burden of proof in showing justification is on the defendants. Soap Co. v. Ecolab, 646 So.2d 1366, 1371 (Ala. 1994). Economic competition is a justification. However, because the acts which they assert as a defense are possibly violations of the Robinson-Patman Act they may not be proper economic competition.

A defendant will not be held liable for intentional interference with business relations if it is entitled to the competitor's privilege. Id. at 1369.

> "(1)  One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue in an existing contract terminable at will does not interfere improperly with the other's relation if
>> "(a) the relation concerns a matter involved in the competition between the actor and the other, and
>> "(b) the actor does not employ wrongful means and
>> "(c) his action does not create or continue an unlawful restraint of trade and
>> "(d) his purpose is at least in part to advance his interest in competing with the other.
> "(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will."

Id (citing RESTATEMENT (SECOND) OF TORTS § 768). Allgas states that because it was a competitor of Bailey Gas, it is entitled to assert competitor's privilege. The tank rental agreements between Bailey Gas and its customers were terminable at will. Therefore, Allgas can properly assert the competitor's privilege, so long as none of the above-articulated wrongdoing took place in the course of Allgas's competing with Bailey Gas. However, as with justification, the burden is on the competitor to prove competitive privilege. Id. at 1371. To prove that Allgas's "action does not create or continue an unlawful restraint of trade" would require that the defendants show that Allgas did not engage in anti-competitive activity in violation of the Robinson-Patman Act. Because

---

[34] The defendants raise no other articulated reason as to why the plaintiffs cannot, as a prima facie matter, demonstrate an intentional interference with business relations.

there is a genuine issue of fact on the Robinson-Patman claim, the defendants cannot overcome their summary judgment burden.[35]

The defendants third contest the plaintiff's Alabama Motor Fuels Act claim. They argue that the claim must fail on the sole grounds that because the plaintiff did not sell any propane gas to customers to use as a motor fuel, the claim must fail. The plaintiffs respond by producing a records of a customer who purchased liquid propane as a motor fuel. It would appear that this claim is de minimis and that it should perhaps be dismissed for this reason. The court will not, however, dismiss it at this stage.

Finally, the defendants argue that the plaintiffs cannot prove their Alabama Unfair Trade Practices Act claim[36] because they cannot prove the Robinson-Patman Act claim. The issues are interrelated.

After Brooke Group, nobody can decide such cases with any degree of assurance. Only finality can do this. The court will deny the motion based on a conclusion that there is sufficient evidence to create a reasonable inference that a dominant firm successfully targeted a competitor. Other issues are likely also factual. The motion will be **DENIED**.

This ___ day of September 1997.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[35] The court acknowledges that this claim may be weak and meaningless if there is or is not a Robinson-Patman claim.

[36] The defendants admit that Alabama's Unfair Trade Practices Act tracks federal antitrust law.