IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

P. DAVID BAILEY and DORIS          }
BAILEY,                            }
                                   }
       Plaintiffs,                 }
                                   }
v.                                 }          CASE NO. CV 96-B-0631-S
                                   }
ALLGAS, INC., et al.,              }
                                   }
       Defendants.                 }

## MEMORANDUM OPINION

Currently before the court is Defendants' Motion to Strike the Expert Testimony of

Gunther and Motion for Summary Judgment filed by defendants Allgas, Inc. ("Allgas"),[1]

Lampton-Love, Inc. ("Lampton-Love"), Liquified Petroleum Gas Management, Inc. ("Liquified

Petroleum") and William Ervin ("Ervin").[2]  Plaintiffs P. David Bailey ("Bailey") and Doris

Bailey (collectively, "plaintiffs") filed suit against defendants alleging claims for violations of

the Robinson Patman Act, the Alabama Unfair Trade Practices Act, the Alabama Motor Fuel

Marketing Act, and a claim for tortious interference.  Upon review of the record, the submissions

of the parties, the argument of counsel, and the relevant law, the court is of the opinion that

defendants' Motions are due to be granted.

---

[1]  This Motion for Summary Judgment is addressed to plaintiffs' Robinson-Patman Act
claim.  On May 19, 2000, defendants filed a separate Motion for Summary Judgment as to
plaintiffs' tortious interference and Unfair Trade Practices Act claims.  Defendants' second
motion will be addressed in a separate Memorandum Opinion.

[2]  The defendants will be collectively referred to as "defendants."

## I.  FACTUAL AND PROCEDURAL HISTORY

**A.**   **Background**

Defendant Allgas is in the business of distributing and selling liquid propane gas in Alabama.  (Complaint ("Compl.") at ¶ 9; Deposition of Bill Ervin ("Ervin Dep."), included in plaintiff's Second Submission in Opposition to Motion for Summary Judgment, at 46-49, 55-60.) Allgas has six district offices in northern Alabama.  (Ervin Dep. at 55-57.)  One of Allgas's district offices is located in the town of Altoona, which is in the eastern part of Etowah County, Alabama.  (*See* Ex. B, attached to Joint Motion to Supplement Record on Appeal, filed October 5, 1998.)   Defendant Lampton-Love is Allgas's parent company; it does not distribute or sell liquid propane gas in Alabama.  (Compl. at ¶ 13; Deposition of Robert Y. Love ("Love Dep."), included in plaintiffs' Second Submission in Opposition to Motion for Summary Judgment, at 12-13.)  Defendant Liquified Petroleum is a company related to Allgas; it bills and collects the accounts of Allgas customers.  (Compl. at ¶ 14; Love Dep. at 16, 19, 23; Ervin Dep. at 31.) Defendant Ervin is the President of Allgas.  (Compl. at ¶ 15; Love Dep. at 43-45; Ervin Dep. at 23.)

In August 1984, Allgas hired Bailey to manage the Altoona district office.  (Compl. at ¶ 6; Ervin Dep. at 111-12.)  Shortly after becoming manager, Bailey hired as Allgas employees his brother Max Bailey and several relatives.  (Ervin dep. at 139-41; Love Dep. at 99-100; Deposition of Pronce David Bailey ("P.D. Bailey Dep."), attached as Ex. C to defendants' Appendix of Evidence, at 28, 166-67.)

The Altoona district employed four truck drivers who delivered gas to Allgas customers. (P.D. Bailey Dep. at 76.)  Each driver had his own route covering a specific geographic sector of the district's service area.  (*Id.* at 79-80.)  As in most liquid propane businesses, the drivers

2

tended to develop a relationship with their customers.  (*Id.*)

In 1991, Ervin, the President of Allgas, promoted Bailey to manager of Allgas's Gardendale district office in Cullman County, Alabama. (Ervin Dep. at 114; P.D. Bailey Dep. at 32-33.)  Around the same time, Ervin also promoted Max Bailey to replace his brother as manager of the Altoona district office. (Deposition of Max Bailey ("Max Bailey Dep."), attached as Ex. D to plaintiffs' Appendix of Evidence, at 29-32.)  In October 1993, after a dispute with management at Allgas, Bailey resigned his manager's position at Allgas.  Bailey decided to start his own business in competition with Allgas. (Ervin Dep. at 124-28; P.D. Bailey Dep. at 98-100.)  In early 1994, Bailey obtained a $400,000 loan from the United States Small Business Administration ("SBA") to fund the business. (Compl. at ¶ 7; P.D. Bailey at 111-15.)

In September of 1994, P.D. Bailey then started his own propane business, Bailey's Propane Gas. (Max Bailey Dep. at 79-81, 83; Compl. at ¶ 8.)  The company was headquartered in the town of Susan Moore, which is located not far from Allgas's Altoona district office. (*See* Max Bailey Dep. at 80; *see also* Ex. B, attached to Joint Motion to Supplement Record on Appeal, filed October 5, 1998.)  Bailey's Propane Gas intended to serve principally Blount County and parts of Etowah, Marshall, Cullman, and St. Clair counties. (Plaintiffs' Response to Interrogatories by Defendant, attached as Ex. G to Defendants' Addendum of Evidence, filed March 24, 1997, at No. 7.)  Plaintiffs admit that over eight other companies sold liquid propane in this tri-county area, including Allgas, Amerigas, Country Gas, Dowdle Butane Gas, Empire Gas, Ferrell Gas, Jordan Gas, and Southland Gas. (*Id.* at No. 8.)

In August, Bailey hired Max Bailey away from his manager's position in the Allgas Altoona office. (Ervin Dep. at 140-41; Max Bailey Dep. at 79-81.)  Bailey also hired two other Allgas employees from the Altoona office, and another from the Gardendale office where he had

3

previously worked. (Max Bailey Dep. at 72-81; P.D. Bailey Dep. at 103-10, 115-16; Ervin Dep. at 219-21.) Bailey asked other Allgas employees to come to work for him as well. (*Id.*)

In mid-August 1994, Allgas dropped the price of gas sold to its residential customers in the Altoona service area from 67 cents to 50 cents per gallon. (Ervin Dep. at 274-80.) Allgas contends that the price was reduced to avoid losing customers to Bailey's Propane Gas, which intended to offer gas at a discount, and reduce the risk of losing the Altoona office's truck drivers. (*Id.* at 279-81.) Plaintiffs, however, allege that Allgas dropped its prices to drive them out of business. (Compl. at ¶ 10.)

In late December 1994, Allgas began to raise its residential prices in the Altoona office from 50 cents to 65 cents. (Ervin Dep. at 285-86.) In 1995, the Altoona office continued to increase the price of gas in the residential sector.

In August 1995, Bailey's Propane Gas went out of business for which plaintiffs blame Allgas's low gas prices. (Compl. at ¶ 16.) Subsequently, plaintiffs defaulted on the SBA loan of $400,000. (Compl. at ¶ 17.) Allgas argues that the failure of plaintiffs' business was caused by Bailey's mismanagement of the $400,000 loan from the SBA. (Defendants' Memorandum in Support of their Motion to Strike the Expert Testimony of Gunther and their Motion for Summary Judgment, submitted October 22, 1999, at 7.) Allgas also contends that the demise of plaintiffs' business was partly the result of unseasonably warm weather during the winter months of 1994-95, which greatly reduced the demand for liquid propane for heating. (*Id.*)

**B.** **Proceedings of the Lawsuit**

In March 1996, plaintiffs brought this antitrust suit against defendants. Plaintiffs alleged, *inter alia*, that defendants violated the Robinson-Patman Act by engaging in predatory pricing to drive plaintiffs out of business. On March 13, 1997, pursuant to Fed. R. Civ. P. 26, plaintiffs

4

submitted the expert report of William Gunther ("Gunther"), then Professor of Economics at the University of Alabama. (Expert Report prepared by William D. Gunther, Ph.D. ("Gunther's report"), attached as Ex. E to defs.' Appendix of Evidence.)  In his report, Gunther purported to have analyzed core antitrust issues in the case, such as the definition of the relevant product and geographic markets, the market power of Allgas and other competitors, Allgas's purported recoupment of losses, and barriers to entry. (*See id*.)  On March 19, 1997, defendants took Gunther's deposition.  (Deposition of William David Gunther, Ph.D. ("Gunther Dep."), attached as Exhibit F to defs.' Appendix of Evidence.)  At the deposition, Gunther offered only five documents in support of his opinions.  (*See id.*)

On March 24, 1997, defendants filed a Motion for Summary Judgment.  On April 25, 1997, defendants moved to strike the affidavits of Max Bailey and Gunther, which were submitted in support of plaintiffs' Opposition to Summary Judgment.  On September 24, 1997, Judge Robert B. Propst denied defendants' Motion for Summary Judgment and Motion to Strike. In denying the motions, Judge Propst did not focus on the issue of the relevant geographic market because defendants had not raised that issue in their motion.

The case was set for trial on March 16, 1998.  On February 18, 1998, upon defendants' Motion, Judge Propst informed the parties that he would conduct a Rule 104 hearing relating to Defendants' Motion to Strike the Affidavit of Max Bailey and the Expert Report, Testimony, and Affidavit of Gunther.  On March 11, 1998, after briefing by the parties, Judge Propst held a day-long Rule 104 hearing.  At the hearing, plaintiffs conceded that an essential element of the Robinson-Patman claim is the relevant geographic market and that they carried the burden of proof on that issue. (Transcript of March 11, 1998 Rule 104 Hearing, attached as Exhibit G to defs.' Appendix of Evidence, at 11-12, 20-21, 32.)  Plaintiffs further admitted that expert

testimony was necessary to establish the relevant geographic market. (*Id.*) Thus, if Gunther's testimony on the relevant geographic market was not admitted, plaintiffs could not prove the Robinson-Patman claim.

On March 15, 1998, Judge Propst informed the parties that he wished to continue the Rule 104 hearing in chambers the morning of March 16, the day the trial was to begin. When the hearing resumed, Judge Propst extensively questioned plaintiffs' counsel about the reliability of Gunther's expert report, his deposition, and his affidavit. (Vol. II of Transcript of Rule 104 Hearing, attached as Ex. H to defs.' Appendix of Evidence.) At the conclusion, Judge Propst entered an Order excluding Gunther from testifying on the relevant geographic market because his testimony was unreliable. Accordingly, Judge Propst granted Defendants' Motion for Summary Judgment on the Robinson-Patman claim.[3]

Plaintiffs appealed the final judgment to the Eleventh Circuit Court of Appeals. In June 1999, the Eleventh Circuit reversed, holding that Judge Propst had "erred by conflating the admissibility of Gunther's evidence with the sufficiency of that evidence to overcome Allgas's motion for summary judgment." (Appellate Opinion at 9.) (emphasis in original.) The Eleventh Circuit expressly invited the district court on remand to determine, *inter alia*, whether Gunther's opinions on the relevant geographic market and Allgas's market power are admissible and whether plaintiffs have presented sufficient evidence to support their claim. (*Id.* at 16 n.5.)

---

[3] Judge Propst further concluded that without the Robinson-Patman claim, plaintiffs' claims for tortious interference and violation of the Alabama Unfair Practices Act failed. (*Id.* at 64-65.) By consent of the parties, Judge Propst then dismissed plaintiffs' sole remaining claim, brought under the Alabama Motor Fuel Marketing Act, as well as defendants' counterclaims. (*Id.* at 73-84.)

On remand, Judge Propst directed that the case be reassigned to another judge. Upon reassignment to the undersigned judge, defendants again moved to strike the testimony (and expert report) of Gunther and for summary judgment. This court has reviewed the same evidence that led Judge Propst to deem Gunther's opinions unreliable and inadmissible and has reached the same conclusion. In the context of the motion to strike, the issues are: (1) whether the *Daubert* "reliability" factors apply to these facts; (2) if not, whether Gunther's opinions on the relevant geographic market and Allgas's market power are so unreliable that they are rendered inadmissible; and (3) whether Gunther's evidence with respect to the relevant geographic market and Allgas's market power are insufficient to support Bailey's claim.

## II.  DISCUSSION

### A.    "Law of the Case"

Defendants contend that Gunther's opinions on the relevant geographic market and Allgas' market power are both inadmissible and insufficient to support plaintiffs' Robinson-Patman claim. (Defs.' Mem. in Supp. of their Motion to Strike the Expert Test. of Gunther and their Motion for Summ. J. ("Defs.' Br.") at 4.) Plaintiffs counter that the "law of the case" doctrine precludes the court from considering those issues. *(See* plaintiffs' Brief in Opposition to Defendants' Motion to Strike the Expert Testimony of Gunther and Motion for Summary Judgment ("Pls.' Br.") at 4-6.) Plaintiffs argue that the court's hands are tied because the Eleventh Circuit held that the "district court abused its discretion by disqualifying Gunther's expert evidence despite the apparent sufficiency of that evidence to meet the standard of Rule 702." (*Id.* at 6.) The court disagrees.

"Under the law of the case doctrine, both the district court and the court of appeals generally are bound by findings of fact and conclusions of law made by the court of appeals in a

prior appeal of the same case." *United States v. Robinson,* 690 F.2d 869, 872 (11th Cir. 1982). Thus, the mandate issued by an appellate court constitutes the law of the case on issues that were either explicitly or implicitly decided by the appellate tribunal. 1B James W. Moore, Moore's Federal Practice ¶ 0.404 at 172-74 (Fed. Cir. 1991). However, the Eleventh Circuit has noted:

> The doctrine provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. The purpose of the doctrine is to bring an end to litigation by foreclosing the possibility of repeatedly litigating an issue already decided. The law of the case doctrine does not, however, require rigid adherence to rulings made at an earlier stage of a case in all circumstances. The doctrine directs a court's discretion, it does not limit the tribunal's power.

*Murphy v. Federal Deposit Insurance Corp.,* 208 F.3d 959, 965 (11th Cir. 2000) (internal quotations, citations, and punctuation omitted).

Judge Propst's decision was reversed and remanded because he purportedly "erred by conflating the admissibility of Gunther's evidence with the sufficiency of that evidence to overcome Allgas's motion for summary judgment." (Appellate Opinion at 9.) (emphasis in original.) According to the Eleventh Circuit, when conducting the admissibility analysis, Judge Propst should have considered whether or not *Daubert* applies to the facts of this case.[4] (*Id.* at 10.)

In light of this, the Eleventh Circuit "vacate[d] the grant of summary judgment in favor of Allgas and remand[ed] for a determination of whether summary judgment is still appropriate in light of Gunther's evidence." (Appellate Opinion at 15-16.) In elaborating, the Eleventh Circuit stated:

---

[4] Plaintiffs apparently agree with this assessment. (*See* Pls.' Br. at 6) ("It is important to understand what has transpired on appeal and why Judge Propst was reversed. In the first place, he never went through an appropriate Rule 702 analysis as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2789 (1993).").

> We do not address the following issues, which the district court
> identified but did not reach:  1) Allgas's contention that Gunther's
> identification of the relevant geographic market is unreliable and
> must be excluded [*i.e.*, whether Gunther's opinion on the relevant
> geographic market is admissible]; and 2) its contention that
> Gunther's estimation of Allgas's market power is also unreliable
> and due to be excluded [*i.e.*, whether Gunther's opinion on market
> power is admissible].  Nor do we address whether, *even with the
> aid of Gunther's expert evidence*, Bailey has failed to raise a
> genuine issue of material fact with respect to his Robinson-Patman
> claim, particularly in light of the district court's enumeration of the
> problems with Gunther's efforts to define a relevant geographic
> market.  *The district court may address these and other matters on
> remand.*

(*Id.* at 16 n.5.) (emphasis added).

Thus, far from barring the court from addressing the admissibility and/or sufficiency of

Gunther's opinions on the relevant geographic market and market power, the Eleventh Circuit

expressly invited this court to do so.  Thus, defendants' renewed Motions to Strike and for

Summary Judgment are plainly appropriate.

**B.    Robinson-Patman Primary-Line Price Discrimination**

The Robinson-Patman Act makes it unlawful, under certain circumstances, to

discriminate in price between different purchasers of commodities where the effect of such

discrimination may be substantially to lessen competition or tend to create a monopoly in any

line of commerce, or injure, destroy or prevent competition with any person who either grants or

knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).  Plaintiffs assert against Allgas a "primary-line" price discrimination claim

under the Robinson-Patman Act (which is also known as a "predatory pricing" claim).  An

example of a primary-line price discrimination claim is a manufacturer selling its product at a

below-cost price for the purpose of driving a competitor out of business.  *See, e.g., Best*

*Beverages, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 584 n.1 (2d Cir. 1987).[5]

The essence of plaintiffs' primary-line price discrimination claim is that Allgas allegedly "lowered the price of liquid propane gas to an exceptionally low level only in the district in which Plaintiffs were selling a competing product." (Compl. at ¶ 36.) Thus, plaintiffs allege that Allgas "discriminated unlawfully and in violation of 15 U.S.C. §13(a) in pricing the product . . . in furtherance of their scheme to monopolize the sale of liquid propane gas in the Blount, Etowah and Marshall County areas." (*Id.* at ¶ 37.)

In *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221 (1993), the Supreme Court held that "primary-line competitive injury under the Robinson-Patman Act is of the same general character as the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act." Accordingly, "the essence of the claim under either statute is the same: A business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices *in the relevant market*." *Id.* at 222. (emphasis added).

In order to prevail on a Robinson-Patman primary-line claim, a plaintiff must establish below cost pricing of the product and "injury to competition." *Id.* at 222-224. To show injury to competition, that is, that the defendant possessed market power so it could recoup its losses with supra competitive prices, a plaintiff must establish, *inter alia*, the relevant product and geographic markets, defendant's market power, barriers to entry, and possible recoupment of the defendant's losses. *See Bathke v. Casey's General Stores, Inc.*, 64 F.3d 340, 344-45 (8th Cir.

---

[5] The other type of violation under the Act, not at issue here, is called "secondary-line" price discrimination; that kind of claim involves, for example, a manufacturer selling the same product to different customers at different prices. *Best Beverages, Inc.*, 842 F.2d at 584 n.1. In that instance, the disfavored customer claims injury. *Id.*

10

1995); *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 994 (11th Cir. 1993); *Clark v. Flow Measurement, Inc.*, 948 F. Supp. 519, 526 (D.S.C. 1996).[6]

Under controlling Eleventh Circuit law, a plaintiff must use expert testimony to establish the relevant geographic market and defendant's purported market power. *See Colso Corp. v. Martin Marietta Services, Inc.*, 133 F.3d 853, 855 n.4 (11th Cir. 1998); *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1578-79 (11th Cir. 1985).

### 1. Antitrust Definition of Market Power[7]

Market power is "'the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market.'" *U. S. Anchor,* 7 F.3d at 994. Typically, courts examine a defendant's market share in the relevant market to determine if it possesses market power. *See United States v. Paramount Pictures*, 334 U.S. 131, 174 (1978); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *International Boxing Club v. United States*, 358 U.S. 242, 249 (1959)*; see also U.S. Anchor*, 7 F.3d at 999 ("The principal measure of actual

---

[6] The Supreme Court has repeatedly stated that Robinson-Patman claims should be viewed with skepticism. "[P]redatory pricing schemes are rarely tried, and even more rarely successful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589 (1986). "[T]he costs of an erroneous finding of liability are high." *Brooke Group*, 509 U.S. at 226. "[T]he mechanism by which a firm engages in predatory pricing -- lowering prices -- is the same mechanism by which a firm stimulates competition; because cutting prices in order to increase business often is the very essence of competition . . .[;] mistaken inferences . . . are especially costly, because they chill the very conduct that antitrust laws are designed to protect." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 122 n.17 (1986) (*quoting Matsushita*, 475 U.S. at 594).

[7] Market power is also sometimes referred to as "monopoly power." *See U.S. Anchor,* 7 F.3d at 994 n.12.

11

monopoly power[8] is market share."). Further, the Eleventh Circuit has noted:

> When assessing market shares for the purpose of ascertaining market power the appropriate measure of a firm's share is the quantity of goods or services actually sold to consumers. Although revenues are often relied upon as a surrogate for quantity, actual unit sales must be used whenever a price spread between various products would make the revenue figure an inaccurate estimator of unit sales.

*U. S. Anchor,* 7 F.3d at 999 (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 341 n.69 (1962)).

If a company's market share is large enough for it to control prices or exclude competition, then market power exists. *Id.* The Eleventh Circuit and other circuits as well have held that a defendant controlling less than fifty percent of market share in the relevant geographic market does not possess market power whereby the company may control prices or exclude competition. *See, e.g., U.S. Anchor,* 7 F.3d at 1000-01 (Fifty percent market share is insufficient); *Morgenstern v. Wilson,* 29 F.3d 1291, 1296 (8th Cir. 1993) (Thirty percent market share insufficient); *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 271 (7th Cir. 1981) (Thirty percent market share insufficient); *United States v. Empire Gas Corp.,* 537 F.2d 296, 305 (8th Cir. 1976) (Forty-seven to fifty percent market share insufficient). Indeed, one court found that even fifty-five percent market share was not enough. *See Fineman v. Armstrong World Indus. Inc.,* 980 F.2d 171, 201 (3rd Cir. 1992).

## 2. *Antitrust Definition of the Relevant Geographic Market*

"Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case arising under Section 2." *U.S. Anchor,* 7 F.3d at 994; *see also Ad-Vantage Telephone Directory Consultants,*

---

[8] As noted, *infra* at n.7, monopoly power and market power are synonymous.

*Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1341 (11th Cir. 1987); *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1579 (11thCir. 1985) ("Proof of the relevant product and geographic market is absolutely essential . . . .").

The relevant geographic market is generally defined as the "area of effective competition," that is, the area "in which the product or its reasonably interchangeable substitutes are traded." *L. A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 423 (11th Cir. 1984). According to at least three Eleventh Circuit decisions, an assessment of the geographic market *must* entail an analysis of several factors, foremost among them the location of competitors and pricing patterns. *See T. Harris Young & Associates v. Marquette Electronics*, 931 F.2d 816, 823 (11th Cir. 1991) ("Price data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors *must be considered* in determining the relevant geographic market.") (emphasis added); *L. A. Draper,* 735 F.2d at 423 ("The location and facilities of other producers and distributors are also *essential* in determining the relevant geographic market" and "[p]rice data . . . are perhaps the most probative evidence on the relevance of the given market.") (emphasis added); *American Key,* 762 F.2d at 1580-81 (rejecting plaintiff's "artificially narrow definition of the relevant geographic market"). The sales area of an antitrust plaintiff has never been a proxy for a geographic market. *Id.* at 1581 ("The relevant market is the 'area of effective competition' in which competitors generally are willing to compete for the consumer potential, and not the market area of a single company.").

### 3.    *Plaintiffs' Contention Regarding Relevant Geographic Market*

Plaintiffs contend that they do not need to prove a relevant geographic market to prevail on their Robinson-Patman claim. (*See* Pls.' Br. at 14-16.) The Eleventh Circuit's decisions

(including the one in this case) say otherwise.

In Section 2 monopolization cases and Robinson-Patman primary-line cases, the Eleventh Circuit has found that "at the outset the appropriate market must be defined or identified."[9] *U.S. Anchor*, 7 F.3d at 994. "Proof of the relevant product and geographic market is *absolutely* essential . . . " *American Key Corp.*, 762 F.2d at 1579 (emphasis added). In keeping with the law of this circuit, Judge Propst stated in his summary judgment opinion that "[b]ecause antitrust law addresses abuses of power by private actors in the marketplace, the threshold problem of defining the relevant market must be addressed before reaching the larger question of whether an antitrust violation actually occurred." (Memorandum Opinion of Judge Robert B. Propst, entered March 25, 1998, at 26.)

On appeal, plaintiffs did not dispute Judge Propst's summary judgment holding that they must prove a relevant geographic market to maintain the Robinson-Patman claim.[10] If plaintiffs truly believe what they now contend, their first argument to the Eleventh Circuit should have been that Judge Propst erred in finding that expert testimony was necessary to establish a

---

[9] Plaintiffs' Robinson-Patman primary-line price discrimination claim is analyzed the same way as a monopolization claim under Section 2 of the Sherman Act. *See Brooke Group* 509 U.S. at 222 (1993).

[10] Indeed, in the Rule 104 hearing on the admissibility of Gunther's opinions, plaintiffs admitted to Judge Propst that they must prove the relevant geographic market:

> COURT:    . . . But, in any event, I don't think that there's any question, is there, that part of the essential proof of any case is to prove both the geographic market and market power and product; is that correct?
>
> STABLER:  I'm going to agree with you. That's what the cases have said.

(Vol. II Transcript of Rule 104 Hearing at 16.)

relevant geographic market when plaintiffs are not required to prove the existence of such a market in the first place.  Such an argument would have been rejected.  In its decision the Eleventh Circuit noted that plaintiffs must prove a relevant geographic market, and prove it with expert testimony, in order to survive summary judgment on remand:

> To be sure, if Gunther's evidence with respect to the relevant geographic market is insufficient to support Bailey's claim, Allgas may yet be entitled to summary judgment, because of Bailey's inability to provide evidence from which a reasonable fact finder could find a relevant geographic market. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993) (defining the market is an indispensable element of monopolization or attempt claims); *American Key Corp.*, 762 F.2d at 1579 ("Construction of a relevant economic market . . . cannot, however, be based on lay opinion testimony.").

(Appellate Opinion at 13.)  Plaintiffs' argument that they do not need to prove the relevant geographic market is without merit.

## C.   "**Daubert**"

### 1.   *Overview of the Law*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court explained the role of district courts in determining whether expert scientific testimony should be admissible.  In determining the admissibility of expert scientific testimony, a district court must determine that the evidence is both reliable and relevant.  *Id.* at 589-92.  In the context of Fed. R. Evid. 702, the Court set out four non-exclusive factors to aid in the determination of whether the methodology is reliable:

> (i)   whether the theory or technique has been tested;
>
> (ii)   whether the theory or technique has been subjected to peer review and publication;
>
> (iii)   the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and,

> (iv)    whether the theory or method has been generally accepted by the
>         scientific community.[11]

*Id.* at 593-94.

In *General Electric v. Joiner*, 522 U.S. 136, 142 (1997), the Supreme Court reaffirmed

its view that district courts must act as a "gatekeeper" in screening proffered scientific

testimony.[12]   The Court in *Joiner* emphasized that "nothing in either *Daubert* or the Federal

Rules of Evidence requires a district court to admit opinion evidence which is connected to

existing data by the *ipse dixit* of the expert. A court may conclude that there is *simply too great*

*an analytical gap between the data and the opinion proffered.*" *Id.* at 146 (emphasis added).

Recently, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme

Court held that *Daubert* also applies to non-scientific expert testimony:

> We agree with the Solicitor General that "[t]he factors identified
> in *Daubert may or may not be pertinent in assessing reliability,*
> *depending on the nature of the issue,* the expert's particular
> expertise, and the subject of his testimony." . . . The conclusion,
> in our view, is that we *can neither rule out, nor rule in, for all*
> *cases and for all time the applicability of the factors mentioned* in
> *Daubert,* nor can we now do so for subsets of cases categorized
> by category of expert or by kind of evidence. *Too much depends*
> *upon the particular circumstances of the particular case at issue.*
> *Daubert itself is not to the contrary. It made clear that its list of*

---

[11]   In other words, a district court must assess "whether the reasoning or methodology
underlying the testimony is scientifically valid and [] whether that reasoning or methodology
properly can be applied to the facts in issue." *Id.* at 592-93. The Court added, however, that
"[m]any factors will bear on the inquiry, and we do not presume to set out a definitive checklist
or test." *Id.*

[12]   The Supreme Court expects district courts to perform this special "gatekeeping" role
even when the task is difficult. "[N]either the difficulty of the task nor any comparative lack of
expertise can excuse the judge from exercising 'gatekeeper' duties that the Federal Rules
impose . . . ." *Id.* at 148. "These stricter standards are necessary because of the potential impact
on the jury of expert testimony." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1310 (11th
Cir. 1999).

> *factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged.* It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist.

*Id.* at 150-51 (emphasis added).

The Court warned that district courts must be given great latitude in deciding if the factors listed in *Daubert* are applicable to the facts of the case at issue:

> [W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert where they are reasonable measures of the reliability of expert testimony.*
> The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether* that expert's relevant testimony is reliable. . . . Thus, whether *Daubert's specific factors are, or are not, reasonable measures of reliability* in a particular case is a matter that the law grants the trial judge broad latitude to determine. *See Joiner, supra*, at 143.

*Id.* at 152-53 (emphasis added).

## 2.    *The Daubert Factors Do Not Apply to this Case*

The threshold question is whether any of the non-exclusive *Daubert* factors apply to the opinions that Gunther has proffered.[13] The court concludes that, because of the nature of the

---

[13] In *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), the Eleventh Circuit stated that scientific (and now non-scientific) expert testimony is admissible when:

(i)     the expert is qualified to testify competently regarding the matters he intends to address;

(ii)    the methodology by which the expert reaches his conclusion is sufficiently

issues presented, the *Daubert* factors are not reasonable measures of reliability in this case.

Because the *Daubert* factors were initially designed for determining the validity of scientific

methods, these factors do not conform easily to an analysis of economic theory as espoused by

Gunther. For example, the court is unaware of the existence of any method for "testing"

Gunther's opinion or whether his method has been (or can be) subjected to "peer review" and

publication. *See In Re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3rd Cir. 1994).

Further, the court is not cognizant of any way in which to determine "the frequency by which

the methodology leads to erroneous results." *Id.*

### 3.   *If Daubert Factors Applied, Gunther's Opinions Are Still Excluded*

Gunther's methodology fails to meet the criteria of professional soundness and validity

that are at the core of *Daubert's* reliability requirement. Plaintiffs bear the burden of proof as to

the reliability of Gunther's methods. *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300,

1306 (11th Cir. 1999) (the "burden of laying the proper foundation for the admission of the

expert testimony is on the party offering the expert, and admissibility must be shown by a

preponderance of the evidence."). Plaintiffs have not met their burden of proof. Plaintiffs have

offered no credible evidence that Gunther's opinion is admissible under *Daubert*. Plaintiffs fail

to apply any of the *Daubert* factors to Gunther's proposed geographic market. Further,

plaintiffs point to no evidence proving that Gunther's methods have been tested (the first

*Daubert* factor) or have a low rate of error (the third factor).

---

reliable as determined by the sort of inquiry mandated by *Daubert*; and,

(iii)   the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

The only assertion plaintiffs make regarding the *Daubert* factors is that Gunther "utilized only those economic principles that are accepted in his field and accompanied his testimony with a stack of books and treatises to support his opinion." (Pls.' Br. at 9.) If this were the case, there should be at least *some* record evidence on two of the four *Daubert* factors: publication of Gunther's methodology (factor two) and its general acceptance in the scientific community (factor four). There is no such evidence.

The materials to which plaintiffs refer–excerpts from three college economic textbooks–are not properly before the court. The excerpts were attached to the Affidavit of William D. Gunther ("Gunther Aff."), which was untimely submitted. Specifically, the excerpts and accompanying affidavit were filed *after* Gunther submitted his Rule 26 expert report, *after* he had been deposed, and *after* the close of discovery. Defendants moved to strike these materials but Judge Propst did not rule on the motion; rather, Judge Propst ruled that Gunther's testimony was substantively unreliable and therefore granted defendants' Motion for Summary Judgment.

Moreover, the textbook excerpts are inapposite. They address pricing issues and barriers to entry, not calculation of a geographic market. (*See* Exs. attached to Gunther Aff.) Thus, plaintiffs' "books and treatises" do not address any methodology for defining a geographic market, much less support the one advanced by Gunther. Further, the court notes that there was only one page in the entire submission describing how to define or calculate a relevant geographic market, and this one page did not even include the entire relevant portion. (*See id.,* Ex. 3 at 370.) Further, a portion of the excerpts stated: "The fundamental pattern is that a firm's market power varies mainly with its market share." (*Id.* at 51.) This contradicts Gunther's market power analysis in which he based his determination on Allgas's rate of return

19

on assets.

The court concludes that Gunther's methodology was seriously flawed. Gunther's testimony reveals that he determined that the relevant geographic market was the 20-mile radius around Susan Moore solely because this was plaintiff's service area.[14] (Gunther Dep. at 51-52, 77-80.) Such analysis is contrary to Eleventh Circuit law. *See American Key*, 762 F.2d at 1581 ("The relevant market is the 'area of effective competition' in which competitors generally are willing to compete for the consumer potential, and *not the market area of a single company*.") (emphasis added); *see also Bathke*, 64 F.3d at 345-46 ("a court would often be mistaken to conclude that a seller's 'trade area,' or the area from which it currently draws its customers, constitutes a relevant geographic market. In fact, the 'trade area' and the 'relevant market' are precisely reverse concepts.").

Gunther did not consider the location of competitors,[15] the pricing practices of competitors,[16] and the transportation costs of competitors, (Gunther Dep. at 39-40, 43-49, 53-

---

[14]  Judge Propst reached the same conclusion: "Dr. Gunther's selection of a 20-mile radius around Susan Moore, Alabama, as the purported geographic market appears to be based *only on the statement of plaintiff P.D. Bailey that his drivers typically drove 20 miles from Susan Moore, which was where plaintiffs were headquartered*." (emphasis added). (Judge Propst's March 25, 1998, Rule 54(b) Order of Dismissal at 2.)

[15]  In responding to a question regarding the location of other competitors, Gunther testified: "I received a fax from Mr. Stabler last week which had locations on it but . . . it did not come out, so the answer is yes, but I could not read it through the fax." (Gunther Dep. at 46.) The court agrees with Judge Propst's conclusion that "[p]erhaps, the most glaring deficiency in the report-deposition is Gunther's total failure to consider the location of other competitors." (Mem. Op. at 28) (emphasis in original.).

[16]  In responding to a question regarding any price analyses Gunther had performed, he stated: "There was only one document in the material that I had.  I believe it was one of the competitors on one date had done, I guess, a telephone survey and had written down prices of the other competitors.  I don't know who it was . . . But it was one particular date in that whole time period so that's the only information that I have on the prices in the other markets of other

54), all of which the Eleventh Circuit has held must be considered. *See T. Harris Young &*
*Assoc. v. Marquette Elec.,* 931 F.2d 816, 823 (11th Cir. 1993); *L.A. Draper,* 735 F.2d at 423.
Plaintiffs have not cited any authority permitting an economist to create a geographic market
without considering the locations, pricing practices, and transportation costs of other
competitors. Thus, nothing in the record supports plaintiffs' bald assertion that the *Daubert*
factors are satisfied.

After considering the *Daubert* factors, the court agrees with the conclusion reached by
Judge Propst: Gunther's opinion on the relevant geographic market is inadmissible. Gunther's
opinion runs contrary to the purpose of *Daubert*, which is "to make certain that an expert . . .
employs in the courtroom the same level of intellectual rigor that characterizes the practice of
an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152. Clearly, Gunther's opinion does
not meet this common sense test.

**D.    Gunther's Opinions Are Unreliable and Inadmissible**

Judge Propst "recommend[ed] *a full reading of the report and the deposition in order to*
*fully grasp the lack of the exercise of expertise* in some [of Gunther's] opinions. . . ." (March
25, 1998 Mem. Op., p. 27 n. 4) (emphasis added.) This court also finds that the lack of
expertise exercised by Gunther is staggering and makes the same recommendation. The court
also notes Gunther's testimony that he had only worked on two antitrust cases prior to this case,
one of which was twenty years ago; he was "fuzzy" as to whether he was required to conduct a
market analysis in either of the prior cases; he was not required to determine whether a
company had monopoly/ market power in either of the cases; he was not required to determine

---

competitors." (Gunther Dep. at 124.)

21

whether a company had or was part of an oligopoly in either of the cases; and none of his expert work has involved consulting or testifying as to claims involving the Robinson-Patman Act or predatory pricing. (Gunther Dep. at 13-20.)

As noted herein, Gunther's methodology is not professionally sound and valid, nor is it legally sound and valid. The court concludes that Gunther's opinion is so lacking in foundation and reliability that it fails to assist the trier of fact in determining the relevant geographic market or defendants' market power and is inadmissible under Fed. R. Evid. 702. Further, the court is of the opinion that "there is simply too great an analytical gap between the data and the opinion proffered." *See Joiner,* 522 U.S. at 146.

### 1. *Gunther's Methodology and Analysis are Deficient*

Although Gunther's report does not specify the materials he reviewed when forming his opinions, which violates Fed. R. Civ. P. 26(a)(2), a review of Gunther's deposition testimony reveal as the sum total of his efforts: (i) two phone calls to the receptionist of an out-of-state trade association[17] in order to learn something about the propane gas industry *in general* (as opposed to the propane gas industry in the alleged geographic market); (ii) "surfing" the Internet to review the home page of that same trade association, again to learn about the propane gas industry *in general*; (iii) reviewing a census report in order to determine the number of people living within 20 miles of Susan Moore, Alabama; (iv) reading a list of the

---

[17] Gunther testified:
"The first time I don't believe I got the name of the person and that was in Lyle, Illinois . . . which is where the association is located. They were apparently having a trade show somewhere and everybody was out. So – then I talked with the Southeast Director of Fuel services for the Southeastern states and I have her name. . . . And then the other call was today . . . Well, the lady that answered the phone and I did not get her name . . . . And I don't know what her title was." (Gunther Dep. at 27-28, 30-31.)

"Fortune 500" and the return-on-assets ("ROA") figures for the companies on the list; and (v) reviewing some documents produced by Allgas.

Gunther did not contact or read the depositions of plaintiffs or any of the competitors in the Altoona, Alabama area; he did not review sales figures, cost data, or prices of competitors, (*see* Gunther Dep. at 43-45, 123-25, 191); he did not review any documents produced by the competitors,[18] (*Id.* at 43-45); and he made no independent determination of whether these competitors were, in fact, competing with plaintiffs or Allgas, (*Id.* at 80). Such deficiencies warrant exclusion of Gunther's testimony as well as a finding of its insufficiency under Rule 56 to support plaintiffs' Robinson-Patman claim. *See Military Services Realty, Inc. v. Realty Consultants of Virginia, Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) (granting summary judgment for defendants on plaintiff's antitrust claims and disregarding affidavit from plaintiff's expert because "the expert based his conclusion on general economic theory and did not conduct any market surveys or other studies of the relevant market to determine the actual effect the [defendants] had on competition."); *see also Brooke Group*, 509 U.S. at 242 ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, . . . it cannot support a jury's verdict. . . . Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.").

### 2. *Gunther's Report Contains Multiple Inconsistencies, Inaccuracies, and Baseless Assertions*

#### a. *Relevant Geographic Market*

First, Gunther could not settle on whether the geographic center for his 20-mile (or 10-

---

[18] In fact, Gunther had no idea where the competitors were located. (Gunther Dep. at 45-47, 50-51.)

23

mile)[19] radius was Susan Moore,[20] where plaintiffs are headquartered, or Altoona, where Allgas's office is located.  (Gunther Dep. at 37-42, 78-80.)  The difference between the two purported geographic areas is enormous and cannot be ignored.  (*See* Ex. B attached to the Joint Motion to Supplement Record on Appeal.)

Apart from whether Susan Moore is the proper place to center his purported relevant geographic market, Gunther's own report and testimony contradict the 20-mile radius. According to the report, the Susan Moore radius is 20 miles because:

> Allgas records [show] the transportation distances from a retailer tank site to customers tends to be *in the range of 10 miles one way or 20 miles round trip.*  That would argue that customers which

---

[19] Gunther testified as follows:

Q:  Now the next sentence says, "Indeed, based upon AllGas records, the transportation distances from a retailer tank site to customers tends to be in the range of 10 miles one way or 20 miles around [sic] trip."
. . .

Q:  Okay.  And based on your calculations, it showed that the Allgas drivers' average daily trip was 10 miles?

A:  Well, it was monthly information, so it would be an average over the month.
. . .

Q:  Okay.  Let me ask you, would a fairer statement of that be that it[s] customers that are more than 10 miles away from the tank site as opposed to 20 miles from the tank site?

A:  Probably, yes.  The way it's phrased there, yeah.

(Gunther Dep. at 34-36.)

[20] Assuming that Gunther's purported relevant geographic market was a 20-mile radius around Susan Moore (which is what plaintiffs have consistently argued), the court again notes that Gunther improperly based that market definition solely on the  fact that, as he understood it, plaintiffs did not sell propane gas outside the 20-mile radius around Susan Moore.  In other words, Gunther's sole justification for his purported geographic market was that it mirrored plaintiffs' purported service area.

> are more than 20 miles away from the tank site would be better
> served by a competitor provided they were located closer.

(*Id.* at 6.) (emphasis added.)

When asked about this statement in the report, Gunther conceded that the radius should

be 10 miles rather than 20 miles. (Gunther Dep. at 36-37.)  Gunther subsequently changed his

testimony again, alleging that the basis of the 20-mile radius around Susan Moore was

plaintiffs' counsel's representation to him that Bailey planned on sending the drivers only 20

miles from Susan Moore. (*Id.* at 78.)  These contradictory statements demonstrate that there is

no economic analysis underpinning Gunther's definition of the relevant geographic market as a

20-mile radius around Susan Moore.

To add to the confusion, and casting further doubt on Gunther's opinion, there is

evidence in the record establishing that plaintiffs served customers *beyond* the 20-mile Susan

Moore radius.  Specifically, plaintiffs' drivers traveled as far away from Susan Moore as Pell

City (33 miles), Gadsden (25 miles) and Decatur (50 miles).  Thus, there is simply no basis in

the record for Gunther's geographic definition.

Gunther conceded that some liquid propane companies may sell beyond a 20-mile

radius:

> So, you know, it wouldn't surprise me to find a person selling
> some gas in markets that are fairly far away, you know, distance
> wise. . . . So, it would not surprise me to find that in any given
> market, you know, that Country Gas may be selling in Attalla and
> Attalla may be selling something in Blountsville.

(Gunther Dep. at 48-49.)

Blountsville, where Country Gas is located, is 28 miles from Attalla.  Attalla is 45 miles

from Birmingham.  Gunther's statements about the range of competitors' truck drivers

25

undermines his definition of the relevant geographic market as a 20-mile radius around Susan Moore. There is no evidence that plaintiffs or plaintiffs' competitors, were limited to a 20-mile radius.

At one point in his deposition, Gunther effectively admitted that his purported "market" was not even an antitrust market. As noted above, the relevant geographic market is generally defined as the "area of effective competition," that is, the area "in which the product or its reasonably interchangeable substitutes are traded." *L. A. Draper & Son*, 735 F.2d at 423. Thus, if a geographic market has been properly defined for antitrust purposes, consumers within that market cannot buy from sellers located outside the market. However, Gunther admitted in his deposition that suppliers located more than 20 miles from Susan Moore -- that is, outside of his purported "market" -- could service consumers located within the Susan Moore 20-mile radius. (Gunther Dep. at 54.) Similarly, there is evidence in the record demonstrating that consumers *inside* the 20-mile radius were *actually buying* from sellers located *outside* that radius -- a phenomenon that is inconsistent, by definition, with Gunther's purported market definition.

Gunther's knowledge about plaintiffs' competitors (including Allgas) was either nonexistent or simply wrong. As previously noted, Gunther testified that he made no independent analyses to determine plaintiffs' competitors, but instead relied on the representations of plaintiffs' counsel. (Gunther Dep. at 39-40, 43-49, 53-54, 80.) Gunther's fundamental lack of knowledge about the purported relevant market was so extensive that he erroneously believed that Allgas had an office in Susan Moore. (February 17, 1998, Supplement Report of Gunther, attached as Exhibit I in Appendix.)

### b.    *Market Power*

Gunther admitted that he made *no effort* to determine the market share of the Allgas

26

Altoona store or of any competitor in the purported relevant geographic market of Susan Moore. (Gunther Dep. at 41, 49-50, 72-73.) He also admitted that he does not know which liquid propane companies compete within the 20-mile radius of Susan Moore or beyond it. (*Id.*)

Further, without *any* independent analysis, Gunther testified under oath that the Allgas Altoona store's market share in its service area is thirty-five to forty percent ***based on opinions expressed by plaintiffs' counsel***. (*Id.* at 49-51.) As an expert, Gunther should have confirmed those representations through his own analyses. *See American Key*, 762 F.2d at 1580 ("Construction of a relevant economic market or a showing of monopoly power in that market cannot . . . be based upon lay opinion testimony.").

Although Gunther testified that the Allgas Altoona office controls between thirty-five and forty percent of the market in the relevant geographic market, the "break-even" analysis he used in the expert report establishes that Allgas's market share *was somewhere between 5.6 and fourteen percent.* (*See* Gunther's report.) The report states:

> The number of housing units within a 20 [mile] radius of Susan Moore is 47,107. The 1990 Census of Housing shows that 35.36% of the occupied housing units in Blount County used "bottled, tank, or LP gas" as their house heating fuel. Applying the 35.36 percent using bottled gas figure produces an estimate of the total potential market of 16,657 units.
>
> The number of gallons of propane which a typical housing unit would consume during a year will depend in part upon the size of the household, the size of the home, and the temperature (especially over the cold months). Mr. P.D. Baily [sic] estimates that a household would consumer [sic] somewhere between 600 and 1,500 gallons of gas during a year. That would make the potential residential demand for propane gas in the Susan Moore market between 9,994,221 and 24,985,553.

(Gunther's report at 8.)

Gunther explained that if plaintiffs obtained 2.7 percent of the market (sold 273,236 gallons), they would have broken even. (*Id.* at 10.) If they had sold 785,553 gallons, plaintiffs would have controlled 7.8 percent of the market. (*Id.*) Here, it is undisputed that the Allgas Altoona store has not sold more than 1.4 millions gallons a year to domestic customers. Thus, based on Gunther's own methodology, the Altoona store's market share ranges from 5.6 to 14 percent in the Susan Moore geographic market, far lower than the thirty-five to forty percent market share about which he testified.

Again, with no independent research other than plaintiffs' counsel's representations, Gunther testified that Dowdle Gas's share of the Altoona service area is between 35-40 percent. (Gunther Dep. at 42-43.) He does not know where Dowdle is located, (*id.* at 50-51), and has never seen any volume data for that competitor. (*Id.* at 43-45, 50, 55.) As a purported expert on the relevant market, Gunther should have confirmed Dowdle Gas's share of the Altoona service area.

As discussed above, Gunther improperly based his market power analysis on rates of return on assets. Gunther does not know the rate of return for the liquid propane industry. (*Id.* at 104-05.) Instead, he simply compared one year of Allgas's rate of return to the median of Fortune 500 companies. (Expert Report of Gunther at 9; Gunther Dep. at 105, 107.) He then compared defendant's rate of return for another year to the rate of return for utility companies. (Gunther Dep. at 110.) As he said, "That's the closest I can come with that level of data." (Gunther Dep. at 110.) Gunther admitted that liquid propane companies are not nearly as capital intensive as utility companies.[21] (*Id.*) Thus, Gunther's comparison was improper and

---

[21] As Gunther conceded in his deposition testimony, (Gunther Dep. at 110-13), the propane industry is different from many other industries in that very few assets are required. *See*

illogical.

Further, Gunther ignored Allgas's rates of return for 1992, which was negative, and 1995, which was only 4.1 percent. (*Id*. at 95-96.) Gunther conceded that one year is not a large enough time frame in which to determine whether a high rate of return is indicative of market power. (Gunther Dep. at 101-03.) Yet, Gunther only analyzed two years -- 1993 and 1994. (Expert Report of Gunther at 9; Gunther Dep. at 95.) Gunther also conceded that Allgas's rate of return actually increased in 1994, the only year that Allgas priced its gas at the alleged predatory level of 50 cents per gallon. (Gunther Dep. at 98-99.) Under Gunther's theory, Allgas's rate of return that year should have decreased. Further, Gunther noted in his report that, "the retained earnings of AllGas, Inc. represent more than the Altoona market." (Gunther Report at 14.) Thus, Gunther's ROA figure represents the profitability of AllGas as a whole rather than only the AllGas Altoona office.

Gunther opined that Country Gas controls twelve to thirteen percent of the market in Altoona. (*Id*. at 50.) Again, that opinion is based on nothing more than plaintiffs' counsel's opinions. (*Id*.) Further, Gunther has no idea where Country Gas is located. (*Id*. at 50-51.) Gunther concluded that Ferrell Gas is a "minor player" in the Altoona market. (*Id*. at 49-50.) Gunther, however, did not know that Ferrell Gas is located in Blountsville, like Country Gas, and that Ferrell Gas's Blountsville store sells almost fifty percent more gas than Country Gas. (*Id*. at 46-47.)

---

*also United States v. EmpireGas Corp.*, 537 F.2d 296, 305 (8th Cir. 1976) ("[A]ll that are needed [to compete in the propane gas industry] are a supply of LP, a truck, and perhaps a storage tank.")

Gunther also opined that the Allgas Altoona store operates in an oligopolistic market.[22] (*See* Gunther Dep. at 68; *see also* Gunther's report and attached letter from Gunther to plaintiffs' counsel.)  Yet, that opinion is based on nothing more than plaintiffs' counsel's representation that the Altoona store and Dowdle each control thirty-five to forty percent of the Altoona store's service area.  (Gunther Dep. at 65-68.)  In accusing Allgas of being an oligopolist, Gunther stated that there tends to be mutual interdependence and conscious parallels in pricing in an oligopolistic market.  (*Id.* at 71-72.)  Gunther admitted that he did not review any price data of competitors.  (*Id.* at 124-25.)  He further admits that he has no knowledge whether any competitors are earning supra competitive profits.  (*Id.* at 195-96.)  Thus, there is no basis for Gunther's conclusion that Allgas is an oligopolist.

Gunther stated: "Entry barriers must be characterized as relatively weak and given information on the existence of economic profits in the industry, entry of new firms would be expected."  (Gunther's report at 9; *See also* Gunther Dep. at 113-14.)  Assuming, contrary to the evidence, that Allgas controlled over fifty percent of the relevant market, plaintiffs must still show high barriers to entry and expansion in order to establish Allgas's market power.  *See, e.g., Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1439 (9th Cir. 1995) ("A . . . showing of substantial or even dominant market share . . . cannot establish market power sufficient to carry out a predatory scheme. . . . [P]laintiff must show that new rivals are barred from entering the market . . . that existing competitors lack the capacity to expand their output to challenge the predator's high price.")  In order to conclude that defendants have the power to

---

[22] An oligopoly is an "[e]conomic condition where only a few companies sell substantially similar or standardized products."  BLACK'S LAW DICTIONARY 1086 (6th ed. 1990).  An oligopoly market "often exhibit[s] [a] lack of competition, high prices and low output of monopoly markets."  *Id.*

control prices, barriers to entry and expansion must be low or non-existent. *See id.* ("To justify a finding that a defendant has the power to control prices, entry barriers must be significant – they must be capable of constraining the normal operation of the market. . . .") Thus, Gunther's opinion that defendants have market power is contradicted by his analysis regarding barriers to entry.

### 3.   *Gunther's Methodology is Contrary to the Law*

#### a. *Relevant Geographic Market*

As the court determined in Part II(B) of this Opinion, plaintiffs were required to prove a relevant geographic market to prevail on their Robinson-Patman claim, and under Eleventh Circuit law, the relevant geographic market must be established through the use of expert testimony. *See Colso*, 133 F.3d at 855 n.4; *American Key*, 762 F.2d at 1478-79. As noted above, Gunther improperly based his market definition solely on the fact that, as he understood it, plaintiffs did not sell propane gas outside the 20-mile radius around Susan Moore. *See American Key*, 762 F.2d at 1581; *see also Bathke*, 64 F.3d at 345-46.

The Eleventh Circuit has expressly rejected the notion that a plaintiff's service area qualifies as a geographic market for antitrust purposes: "The relevant market is the 'area of effective competition' in which competitors generally are willing to compete for the consumer potential, and *not the market area of a single company*." *American Key*, 762 F.2d at 1581 (emphasis added); *see also Bathke*, 64 F.3d at 345-46 ("[A] court would often be mistaken to conclude that a seller's 'trade area,' or the area from which it currently draws its customers, constitutes a relevant geographic market. In fact, the 'trade area' and the 'relevant market' are precisely reverse concepts."); *L.A. Draper*, 735 F.2d at 424 ("Even if [the plaintiff] had shown that the four-state area was the predominant sales pattern [for the product], that evidence

31

without more would have been insufficient to present the [geographic market] issue to the jury.

Although actual sales patterns can aid in the interpretation of ambiguous price data . . . actual

patterns can also be virtually meaningless.") (internal quotation marks omitted).

As previously noted, Gunther ignored three pieces of data that the Eleventh Circuit has

expressly held must be considered when determining the relevant geographic market: the

location of competitors; their pricing practices; and their transportation costs. *See T. Harris*

*Young & Assoc.*, 931 F.2d at 816; *L.A. Draper*, 735 F.2d at 414.  The Eleventh Circuit has made

clear that in defining the relevant geographic market, certain factors, including the location of

the competitors, must be considered.  In *T. Harris Young & Assoc.*, the court held:

> The geographic dimension is the area in which the product or its
> reasonable interchangeable substitutes are traded. *L.A. Draper &
> Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 423 (11th Cir.
> 1984).  Price data and such corroborative factors as transportation
> costs, delivery limitations, customer convenience and preference,
> and *the location and facilities of other producers and distributors
> must be considered in determining the relevant geographic
> market. Id.*  A geographic market is only relevant for monopoly
> purposes where these factors show that *consumers within the
> geographic area cannot realistically turn to outside sellers should
> prices rise within the defined area.*

931 F.2d at 823 (emphasis added).

Similarly, in *L.A. Draper & Son*, the court stated:

> In determining the "area of effective competition" in which a
> product or its reasonably interchangeable substitutes are traded,
> "such economic and physical barriers to expansion as
> transportation costs, delivery limitations and customer
> convenience and preference must be considered." *Hornsby Oil
> Co. v. Champion Sparkplug Co.*, 714 F.2d at 1394. *The location
> and facilities of other producers and distributors are also
> essential in determining the relevant geographic market. . . . If
> sellers within the area are making price and output decisions
> protected from the need to take account of sellers outside the
> area, there is the distinct [geographic] market.  If sellers within*

32

> *the market must take account of sellers outside it, either because*
> *those sellers are mobile and can easily come into the area to sell,*
> *or because buyers are mobile and can easily go outside the area*
> *to buy, the market is being defined to narrowly.*

735 F.2d at 423 (emphasis added).

Remarkably, in attempting to define the relevant geographic market, Gunther made no

effort on his own to learn about the competitors or their locations.  For example, in his

deposition, Gunther testified:

> Q.   Were you aware of any other gas companies selling gas in
>      that market as you defined it?
>
> A.   I'm thinking, in conversations, Mr. Stabler, there were others and I think,
>      in his case, they're all called ETC., et cetera.  I don't remember precisely
>      their names bu they were said to be minor players.
>
> Q.   *Now, did you make the determination they were minor*
>      *players or was this represented to you by the attorneys?*
>
> A.   *It was represented to me.*

(Gunther Dep. at 39-40.) (emphasis added.)

> Q.   *Now, do you know where Dowdle Gas is located?*
>
> A.   *I received a fax from Mr. Stabler* last week which had
>      locations on it but in the same way that my faxes appear,
>      did not come out, it did not come out, so, the answer is
>      yes, *but I could not read through the fax.*  So –
>
> Q.   Okay.  *What about Country Gas?*  Do you remember?
>
> A.   I think there were a variety of dots on the map in the same
>      way that we're beginning to do that here.
>
> Q.   Okay.
>
> A.   *But I could not discern or read from the fax.*

(*Id*. at 45-46.) (emphasis added.)

Q.  All right.  But I guess my question is, *you made a decision to include Country Gas in the Altoona market, correct*?

A.  Well, in -- in that particular table, *yes*.

Q.  So, *if there is another gas company that is also selling exactly where - - this is headquartered where Country Gas is, shouldn't that be included in the market*?

A.  *Well, it may be in what we refer to there as et cetera.*

Q.  Okay.  Well, *is Ferrell Gas included in this et cetera*?

A.  In the -- in the sense that I don't have the volume numbers.  All I have is the statements that in that market, Dowdle had 35 to 40 percent, Allgas had 35 to 40  and Country Gas had 12 to 13.  Then by simple logic, the rest of it must have belonged to all the other players.  So, *I don't have any information as to exactly how much each of those other players sold or where their specific offices were located.*

Q.  Okay.  And *that is basically because you are relying on the representations of the attorneys*?

A.  *That's correct.*

Q.  As to what the market share is?

A.  That's correct.

Q.  Okay.  And *as you sit here now, you are not aware - you really do not know where the offices of these different companies are located; is that right*?

A.  *Not at this time, no.*

(*Id.* at 49-51.) (emphasis added.)

Q.  For example, if we were to draw a 20 mile radius around Susan Moore --

A.  Uh-huh.

Q.  -- but we also --  *What you just mentioned was that you could have some competitors who were also 20 miles*

34

> *removed from that boundary, right?*
>
> A.    *Right.*
>
> Q.    That could compete?
>
> A.    Right.
>
> Q.    *Have you made any effort to see who those competitors might be?*
>
> A.    *No.*

(*Id.* at 54.) (emphasis added.)  Because Gunther based his market definition solely on plaintiffs' service area and ignored the location, pricing practices, and transportation costs of plaintiffs' competitors, his market analysis runs contrary to well-established law.

### b.    *Market Power*

As noted in part II(B) of this Opinion, plaintiff must establish that defendant possessed market power so it could recoup its losses with supra competitive prices, *see, e.g., U.S. Anchor*, 7 F.3d at 994, and plaintiff must establish defendant's purported market power through the use of expert testimony, *see Colso Corp.*, 133 F.3d at 855 n.4; *American Key Corp.*, 762 F.2d at 1478-79.  Gunther claimed that the true test of market power is "concentration ratios or other indices[,]" not market share.  (*Id.* at 65.)[23]  However, this is contradicted by Eleventh Circuit

---

[23]  Gunther testified:

> Q:    But, in your mind, to determine whether the market is competitive, you are not so much looking at the market share?
>
> A:    That's right.
>
> Q:    You are really looking at the return on the – For example, you are in here to discuss the rate of return on assets, right?
>
> A:    Right.
> . . .
> Q:    Now, would it be true that if one of the companies in a particular market has a higher rate of return than the others, but all of them are higher than

jurisprudence. *See, e.g., U.S. Anchor*, 7 F.3d at 999 ("The principal measure of [market] power

is market share . . . ."); *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1505 (11th Cir.

1988) ("The best test from which market power may be inferred is relative size, i.e., the

percentage of market share." citing *United States v. Grinnell Corp.,* 384 U.S. 563, 571 (1966)).

Gunther opines that Allgas was earning excessive rates of returns on assets of 12.12

percent in 1993, and 13.55 percent in 1994. (Expert Report of Gunther at 9.)  According to

Gunther, these "high" rates of return when compared to Fortune 500 companies show that

Allgas, and by inference the Altoona store, possessed market power.  (*Id.* at 8-9)[24]  As Gunther

simplistically explains, "if they are earning more, they have more market power."  (Gunther

Dep. at 74-75.)  However, one cannot conclude that Allgas engaged in oligopolistic behavior

simply because of the fact that it was allegedly profitable.

As noted, market power is "the power to raise prices to supra-competitive levels or . . .

the power to exclude competition in the relevant market either by restricting entry of new

competitors or by driving existing competitors out of the market." *U. S. Anchor,* 7 F.3d at 994.

---

> normal . . . would that one tend to have greater market power than the others, in your mind?
>
> A:  Yes.  By the – by the definition, the difference between price and marginal costs, if they're earning more, they have more market power.
>
> Q:  Okay.  Well, if you are going to make that kind of analysis in a market, wouldn't you have to know what the rate of return is for the other competitors in the market?
>
> A:  No.

(Gunther Dep. at 72-73, 75.)

[24]  Gunther does not know the rate of return for the Allgas Altoona office.  (Gunther Dep. at 86-88.)  Thus, Gunther does not know the one fact that might be relevant under his flawed methodology.

36

The court is unaware of any reported federal antitrust case in which a defendant's purported high rate of return, by itself, established market power. The Seventh Circuit has expressly rejected the theory. *See Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) (Posner, J.) ("[I]t is always treacherous to try to infer monopoly power from a high rate of return" because "not only do measured rates of return reflect accounting conventions more than they do real profits (or losses) . . . but there is not even a good economic theory that associates monopoly power with a high rate of return.") Gunther's market power analysis is contrary to the law.

### 4. *Conclusion*

Gunther's identification of the relevant geographic market is unreliable and must be excluded. Gunther's estimation of Allgas's market power is also unreliable and must be excluded. Gunther's opinion lacks sufficient evidentiary foundation and is replete with inconsistent and inaccurate statements and conclusions. Further, Gunther's methodology is flawed and unreasoned. His conclusions are based upon analyses that are contrary to the law as established by the Eleventh Circuit and the United States Supreme Court, and therefore lack any credible support. Gunther's report and deposition testimony demonstrate an utter lack of expertise and reliability. For all the reasons stated in this Opinion, the court concludes that Gunther's testimony and report are inadmissible and do not meet the requirements for admissibility under Fed. R. Evid. 702 inasmuch as such evidence does not assist the trier of fact in understanding or resolving the questions regarding the relevant geographic market or defendants' market power.

### E.   Gunther's Testimony is Insufficient to Support Plaintiff's Claim

Gunther's opinions on the relevant geographic market, as expressed in the expert report and his deposition testimony, are fundamentally unreliable and self-conflicting. Further, to the

extent Gunther employed any methodologies in reaching his conclusions, they are inaccurate or flawed. Gunther's opinions on the purported market power of Allgas are also grossly deficient in terms of methodology and analyses of the underlying facts. Further, Gunther's opinions are, as a matter of law, insufficient evidence to support plaintiffs' Robinson-Patman claim. Other than Gunther's bare assertion, there is no methodology underlying his opinions that Allgas possesses market power. Further, the very facts upon which Gunther relies demonstrate that Allgas's market share is far below fifty percent. As the courts have noted, this is insufficient. *See, e.g., U.S. Anchor*, 7 F.3d at 1000-01 (Fifty percent market share is insufficient); *Morgenstern*, 29 F.3d at 1296 n.3. (Thirty percent market share insufficient); *Lektro-Vend Corp.*, 660 F.2d at 271 (Thirty percent market share insufficient); *Empire Gas Corp.*, 537 F.2d at 305 (Forty-seven to fifty percent market share insufficient); *Fineman*, 980 F.2d at 201 (fifty-five percent market insufficient). Given this, the court finds that Gunther's opinions on market power are fundamentally unreliable and, thus, inadmissible. Moreover, those opinions, even if admissible, are insufficient evidence to support a finding of market power, an essential element of plaintiffs' Robinson-Patman claim. Therefore, the court is of the opinion that defendant's Motion to Strike is due to be granted as is defendant's Motion for Summary Judgment.

## III.   CONCLUSION

For the reasons set forth above, defendants' Motion to Strike Gunther's Opinions on the Relevant Geographic Market and Allgas's Market Power is due to be granted. Because plaintiffs cannot establish the relevant geographic market and Allgas's market power without Gunther's expert testimony, defendants' Motion for Summary Judgment on the Robinson-Patman claim is also due to be granted. *See Colso Corp.*, 133 F.3d at 855 n.4; *American Key Corp. v. Cole National Corp.*, 762 F.2d at 1478-79. Additionally, defendants are entitled to summary judgment because, even if Gunther's opinions were reliable and thus admissible, they

would not constitute sufficient evidence to support plaintiffs' Robinson-Patman claim.

     **DONE** this 29th day of September, 2000.

 

                                **SHARON LOVELACE BLACKBURN**
                                United States District Judge