FILED
01 JAN -9 PM 3: 14
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| P. DAVID BAILEY and<br>DORIS BAILEY,<br><br>        Plaintiffs,<br><br>v.<br><br>ALLGAS, INC. et al.,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)   CV 96-B-0631-S<br>)<br>)<br>)<br>) |

ENTERED
JAN - 9 2001

## MEMORANDUM OPINION

Currently before the court is Defendants' Motion for Summary Judgment on Plaintiffs' Tortious Interference and Unfair Trade Practices Claims filed by defendants Allgas, Inc. ("Allgas"), Lampton-Love, Inc. ("Lampton-Love"), Liquified Petroleum Gas Management, Inc. ("Liquified Petroleum") and William Ervin ("Ervin").[1] Plaintiffs P. David Bailey ("Bailey") and Doris Bailey (collectively, "plaintiffs") filed suit against defendants alleging claims for violations of the Robinson Patman Act, the Alabama Unfair Trade Practices Act, the Alabama Motor Fuel Marketing Act, and a claim for tortious interference with business relations.[2] Upon review of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that defendants' Motion is due to be granted.

---

[1] The defendants will be collectively referred to as "defendants."

[2] The court issued a Memorandum Opinion and Order, dated September 29, 2000, granting defendants' Motion for Summary Judgment on plaintiffs' Robinson-Patman claim. This Opinion addresses only plaintiffs' tortious interference with business relations and Alabama Unfair Trade Practices Act claims.

## I. FACTUAL SUMMARY

Defendant Allgas is in the business of distributing and selling liquid propane gas in Alabama. (Complaint ("Compl.") at ¶ 9; Deposition of Bill Ervin ("Ervin Dep."), included in plaintiff's Second Submission in Opposition to Motion for Summary Judgment, at 46-49, 55-60.) Allgas has six district offices in northern Alabama. (Ervin Dep. at 55-57.) One of Allgas's district offices is located in the town of Altoona, which is in the eastern part of Etowah County, Alabama. (*See* Ex. B, attached to Joint Motion to Supplement Record on Appeal, filed October 5, 1998.) Defendant Lampton-Love is Allgas's parent company; it does not distribute or sell liquid propane gas in Alabama. (Compl. at ¶ 13; Deposition of Robert Y. Love ("Love Dep."), included in plaintiffs' Second Submission in Opposition to Motion for Summary Judgment, at 12-13.) Defendant Liquified Petroleum is a company related to Allgas; it bills and collects the accounts of Allgas customers. (Compl. at ¶ 14; Love Dep. at 16, 19, 23; Ervin Dep. at 31.) Defendant Ervin is the President of Allgas. (Compl. at ¶ 15; Love Dep. at 43-45; Ervin Dep. at 23.)

In August 1984, Allgas hired Bailey to manage the Altoona district office. (Compl. at ¶ 6; Ervin Dep. at 111-12.) Shortly after becoming manager, Bailey hired his brother Max Bailey and several relatives as Allgas employees. (Ervin dep. at 139-41; Love Dep. at 99-100; Deposition of Pronce David Bailey ("P.D. Bailey Dep."), attached as Ex. C to defendants' Appendix of Evidence, at 28, 166-67.)

The Altoona district employed four truck drivers who delivered gas to Allgas customers. (P.D. Bailey Dep. at 76.) Each driver had his own route covering a specific geographic sector of the district's service area. (*Id.* at 79-80.) As in most liquid propane businesses, the drivers tended to develop a relationship with their customers. (*Id.*)

In 1991, Ervin, the President of Allgas, promoted Bailey to manager of Allgas's Gardendale district office in Cullman County, Alabama. (Ervin Dep. at 114; P.D. Bailey Dep. at 32-33.) Around the same time, Ervin also promoted Max Bailey to replace his brother as manager of the Altoona district office. (Deposition of Max Bailey ("Max Bailey Dep."), attached as Ex. D to plaintiffs' Appendix of Evidence, at 29-32.) In October 1993, after a dispute with management at Allgas, Bailey resigned his manager's position at Allgas. Bailey decided to start his own business in competition with Allgas. (Ervin Dep. at 124-28; P.D. Bailey Dep. at 98-100.) In early 1994, Bailey obtained a $400,000 loan from the United States Small Business Administration ("SBA") to fund the business. (Compl. at ¶ 7; P.D. Bailey at 111-15.)

In September of 1994, P.D. Bailey then started his own propane business, Bailey's Propane Gas. (Max Bailey Dep. at 79-81, 83; Compl. at ¶ 8.) The company was headquartered in the town of Susan Moore, which is located not far from Allgas's Altoona district office. (*See* Max Bailey Dep. at 80; *see also* Ex. B, attached to Joint Motion to Supplement Record on Appeal, filed October 5, 1998.) Bailey's Propane Gas intended to serve principally Blount County and parts of Etowah, Marshall, Cullman, and St. Clair counties. (Plaintiffs' Response to Interrogatories by Defendant, attached as Ex. G to Defendants' Addendum of Evidence, filed March 24, 1997, at No. 7.) Plaintiffs admit that over eight other companies sold liquid propane in this tri-county area, including Allgas, Amerigas, Country Gas, Dowdle Butane Gas, Empire Gas, Ferrell Gas, Jordan Gas, and Southland Gas. (*Id.* at No. 8.)

In August, Bailey hired Max Bailey away from his manager's position in the Allgas Altoona office. (Ervin Dep. at 140-41; Max Bailey Dep. at 79-81.) Bailey also hired two other Allgas employees from the Altoona office, and another from the Gardendale office where he had previously worked. (Max Bailey Dep. at 72-81; P.D. Bailey Dep. at 103-10, 115-16; Ervin Dep.

3

at 219-21.) Bailey asked other Allgas employees to come to work for him as well. (*Id.*)

In mid-August 1994, Allgas dropped the price of gas sold to its residential customers in the Altoona service area from 67 cents to 50 cents per gallon. (Ervin Dep. at 274-80.) Allgas contends that the price was reduced to avoid losing customers to Bailey's Propane Gas, which intended to offer gas at a discount, and to reduce the risk of losing the Altoona office's truck drivers. (*Id.* at 279-81.) Plaintiffs, however, allege that Allgas dropped its prices to drive them out of business. (Compl. at ¶ 10.)

In late December 1994, Allgas began to raise its residential prices in the Altoona office from 50 cents to 65 cents. (Ervin Dep. at 285-86.) In 1995, the Altoona office continued to increase the price of gas in the residential sector.

In August 1995, Bailey's Propane Gas went out of business for which plaintiffs blame Allgas's low gas prices. (Compl. at ¶ 16.) Subsequently, plaintiffs defaulted on the SBA loan of $400,000. (Compl. at ¶ 17.) Allgas argues that the failure of plaintiffs' business was caused by Bailey's mismanagement of the $400,000 loan from the SBA. (Defendants' Memorandum in Support of their Motion to Strike the Expert Testimony of Gunther and their Motion for Summary Judgment, submitted October 22, 1999, at 7.) Allgas also contends that the demise of plaintiffs' business was partly the result of unseasonably warm weather during the winter months of 1994-95, which greatly reduced the demand for liquid propane for heating. (*Id.*)

## II. DISCUSSION

### A. Tortious Interference with Business/Contractual Relations

Plaintiffs allege that defendants "intentionally and by means prohibited by law sought to and did interfere with the business and/or contractual relationship with [plaintiffs and] their customers by seeking to dissuade those customers from doing business with [plaintiffs]."

4

(Compl. at ¶ 33; *see also* plaintiffs' brief submitted on June 6, 2000 ("Pls.' Br.") at 1-4.) Specifically, "Plaintiffs take the position that the Defendants' unlawfully low price for propane gas caused the Plaintiffs' customers to terminate their tank leases and to switch to the Defendants for tank rental and gas supply. Ultimately enough customers went with the Defendants to put the Plaintiffs out of business." (Pls.' Br. at 2.)

In order to prevail on a claim of intentional interference with business or contractual relations, plaintiffs must establish: (1) the existence of a contract or business relation; (2) defendants' knowledge of the contract or business relation; (3) intentional interference by defendants with the contract or business relation; (4) absence of justification for defendants' interference;[3] and (5) damage to plaintiffs as a result of defendants' interference. *Ex parte Henderson,* 732 So. 2d 295, 297 (Ala. 1999); *Gross v. Lowder Realty Better Homes and Gardens,* 494 So. 2d 590, 597 (Ala. 1986). However, "[u]nder Alabama law, mere interference is not sufficient to create a cause of action for tortious interference with contract rights; to be actionable, interference must be wrongful, malicious, unlawful, or unjustified." *Gross,* 494 So. 2d at 593. The Alabama Supreme Court has also recently stated:

> Defining this cause of action to apply to a "business relation" as well as a "contractual relation" allows a plaintiff a remedy in the situation where a defendant has intentionally interfered with a prospective contract as well as when he has interfered with an existing contract. . . . This rule has always been justified by the policy that "protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking."

*Ex parte Alabama Department of Transportation,* 764 So. 2d 1263, 1270 (Ala. 2000) (citations

---

[3] The Alabama Supreme Court has noted that "the fourth element of tortious interference with business relations, the absence of justification for the interference, really relates to an affirmative defense to be pleaded and proved by the defendant, namely, the defense of justification." *Soap Company v. Ecolab, Inc.,* 646 So. 2d 1366, 1371 (Ala. 1994).

omitted).

### 1. *Prima Facie Case*

Plaintiffs have failed to establish a prima facie case of tortious interference with business relations. Plaintiffs have offered no evidence establishing the existence of a contract or a business relation in existence at the time defendants reduced their prices. Further, plaintiffs have not identified specific customers with whom they had a reasonable expectation of establishing a business relation. Instead, plaintiffs assert that plaintiffs leased propane gas tanks to their customers for one year[4] and, by interfering with the lease contract of each of plaintiffs' customers, defendants also interfered "with the future sales of propane gas to that customer." (Pls.' Br. at 1-2.) Specifically, plaintiffs argue that defendants' "unlawfully low price for propane gas caused the Plaintiffs' customers to terminate their tank leases and to switch to the Defendants for tank rental and gas supply." (Pls.' Br. at 2.) Plaintiffs do not point to any specific tank-rental contracts or to any specific customers to support this argument.[5] Plaintiffs have not identified a single customer whose business they lost due to defendants' actions. Moreover, at the time of the alleged interference, plaintiffs were not charging rent on their

---

[4] Plaintiffs acknowledge that these leases were terminable at will. (Pls.' Br. at 1.)

[5] The court further notes that plaintiffs have not produced any evidence showing that defendants knew of the alleged existence of any specific tank-rental contracts. The evidence only shows that defendants knew plaintiffs were going to open a business and that defendants believed plaintiffs were trying to take defendants' customers away from them. (Ervin Dep. at 133-34, 145-52.) However, defendants acknowledged that "Allgas' price of 50 cents for liquid propane gas was singularly intended to further the company's economic interests by taking customers away from plaintiffs." (Defendants' Memorandum in Support of Their Motion for Summary Judgment on Plaintiffs' Tortious Interference and Unfair Trade Practices Claims ("Defs.' Br.") at 4.)

propane tanks, but were giving them out free of charge.[6] (*See* Max Bailey Dep. at 107, 111.) Further, plaintiffs acknowledged that the lease agreements regarding the propane tanks were terminable at will. (Pls.' Br. at 1.) Because plaintiffs have not delineated a single, specific customer whose business they allegedly lost due to defendants' price reduction, plaintiffs have failed to go "beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *See Celotex,* 477 U.S. at 324.[7] Further, the court's dismissal of plaintiffs' Robinson-Patman claim, as well as the Alabama Unfair Trade Practices Act claim discussed below, precludes plaintiff from establishing that any interference was wrongful, malicious, unlawful, or unjustified. For the reasons discussed above, the court concludes that plaintiffs have failed to put forth sufficient evidence on which a reasonable jury could conclude that defendants' conduct constituted wrongful interference and that plaintiffs suffered damage as a result of that interference. Thus, defendants are entitled to judgment as a matter of law on plaintiffs' claim of tortious interference with business relations.

### 2. *Justification*

Even if plaintiffs had established a prima facie case of tortious interference with business relations, defendants have demonstrated that their conduct was justified. As noted above, justification is an affirmative defense, to be pleaded and proved by the defendant. *Soap Co.,* 646

---

[6] Plaintiffs instituted a policy in which their customers were allowed to use plaintiffs' propane tanks for the first year rent-free, but would be required to pay rent thereafter. (Max Bailey Dep. at 107, 111.)

[7] As noted above, "[t]o survive a motion for summary judgment, the non-moving party must come forward with *specific* evidence of *every* element material to his case so as to create a genuine issue for trial." *Barnett v. Lieserv, Inc.,* 968 F. Supp. 690, 694 n.5 (N.D. Ga. 1997) (citing *Celotex,* 477 U.S. at 323; *Brown v. City of Clewiston,* 848 F.2d 1534, 1537 (11th Cir. 1988)) (emphasis added).

So. 2d at 1371. "Whether a defendant's interference is justified depends upon a balancing of the importance of the objective of the interference against the importance of the interest interfered with, taking into account the surrounding circumstances. . . . Non-justification is synonymous with 'improper.'" *Gross,* 494 So. 2d at 597 n.3. "Legitimate economic motives" and "bona fide business competition" justify a defendant's interference with a competitor's business. *Soap Co.,* 646 So.2d at 1371.

Defendants allege that their motivation legally justified the price reduction. Defendants argue:

> Plaintiffs do not dispute that Allgas' price of 50 cents for liquid propane gas was singularly intended to further the company's economic interests by taking customers away from plaintiffs. Thus, the remaining issue is whether Allgas' 50 cents price was *unlawful*. The Court's recent dismissal of the Robinson-Patman claim answers that question. It also spells the death knell of plaintiffs' tortious interference claim.

(Defs.' Br. at 4) (emphasis in original.) Because the court granted Defendants' Motion to Strike the Expert Testimony of Gunther and Motion for Summary Judgment (on plaintiffs' Robinson-Patman claim), plaintiffs cannot establish that the means used or the objectives sought by defendants were illegal. Thus, defendants are protected by the affirmative defense of justification. *See Griese-Traylor v. First National Bank,* 572 F.2d 1039, 1045 (5th Cir. 1978). "In Alabama, a defendant will not be liable where it acted for a legitimate economic reason. Bona fide business competition is a justification for intentional interference with a competitor's business." *Id.*[8] "Generally, whether the defendant is justified in the interference is a question to

---

[8] Although the Alabama Supreme Court has made no similar statement, the Georgia Supreme Court has held, and this court finds persuasive, that "below-cost pricing by a single defendant is not improper in the absence of some other unlawful element and, thus, is not encompassed by the tort of intentional interference with business relations." *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 443 S.E.2d 833, 836 (Ga. 1994).

8

be resolved by the trier of fact." *Soap Co.,* 646 So. 2d at 1371. However, plaintiffs have offered no admissible evidence establishing that defendants actions were unlawful, and plaintiffs have failed to rebut defendants' contention that the conduct in issue was in furtherance of bona fide business competition. The courts have consistently noted that "competition in business, even though carried to the extent of ruining a rival, constitutes justifiable interference in another's business relations, and is not actionable, so long as it is carried on in furtherance of one's own interests." *See, e.g., Soap Co.,* 646 So. 2d at 1371; *Bridgeway Communications, Inc. v. Trio Broadcasting, Inc.,* 562 So. 2d 222, 223 (Ala. 1990); *Beasley-Bennett Electric Co. v. Gulf Coast Chapter of National Electric Contractors Ass'n.,* 134 So. 2d 427, 429 (Ala. 1961). The Alabama Supreme Court has further noted:

> So long as his manner of conducting business does not offend public morals, and work an injury to the public, it is his constitutional right to pursue, on terms equal to that allowed to others in like business, even though his methods may have a tendency to draw trade to him, to the detriment of competitors.

*Beasley-Bennett,* 134 So. 2d at 429-30 (quoting *City Council of Montgomery v. Kelly,* 38 So. 67, 69 (Ala. 1905). Thus, the court concludes that defendants are entitled to judgment as a matter of law on plaintiffs' tortious interference with business/contractual relations claim based on the affirmative defense of justification.

### 3. *Competitor's Privilege*

A corollary to the tort of intentional interference with business relations is the "competitor's privilege." *Soap Co.,* 646 So. 2d at 1369. "The competitor's privilege is a special form of justification for interference, which can negate the fourth element of a plaintiff's claim." *Alagold Corp. v. Freeman,* 20 F.Supp.2d 1305, 1312 n.3 (M.D. Ala. 1998) (citing *Soap Co.,* 646 So. 2d at 1371). This doctrine provides:

9

> One who initially causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue in an existing contract terminable at will does not interfere improperly with the other's relation if (a) the relation concerns a matter involved in the competition between the actor and the other, and (b) the actor does not employ wrongful means, and (c) his action does not create or continue an unlawful restraint of trade, and (d) his purpose is at least in part to advance his interest in competing with the other.

*Soap Co.,* 646 So. 2d at 1369 (quoting § 768, Restatement (Second) of Torts). Comment e to § 768, Restatement (Second) of Torts provides:

> If the actor employs wrongful means, he is not justified under the rule stated in this Section. The predatory means discussed in § 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section. On the other hand, the actor may use persuasion and he may exert limited economic pressure. . . . The rule stated in this Section rests on the belief that competition is a necessary or desirable incident of free enterprise. Superiority of power in the matters relating to competition is believed to flow from superiority in efficiency and service. If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purpose for which competition is encouraged. . . . [E]conomic pressure on the third person in matters *unrelated* to the business in which the actor and the other compete is treated as an improper interference.

(emphasis added). Defendants have met their burden of proof as to each element. Plaintiffs and defendants were competitors in the propane industry. Further, it is undisputed that defendant's purpose in dropping its prices was to advance its interests in competing against plaintiffs. Defendants did not resort to "physical violence, fraud, civil suits, [or] criminal prosecutions" and did not employ "wrongful means" in dropping their prices. *See Soap Co.,* 646 So. 2d at 1370 (quoting comment e to § 768, Restatement (Second) of Torts). Any economic pressure on a third person was related to business competition between plaintiffs and defendants. Finally, given that the court granted Defendants' Motion To Strike the expert Testimony of Gunther and Motion for Summary Judgment, thereby disposing of plaintiff's Robinson-Patman claim, plaintiffs cannot establish that defendants' actions created or continued an unlawful restraint of trade. Plaintiffs

10

have not established that defendants' conduct violated federal or state antitrust laws. Thus, there is no evidence establishing that defendants illegally reduced prices. The evidence properly before the court shows nothing more than an aggressive business decision on the part of defendants – the exact type of decision that the privilege was intended to reach. *See Soap Co.*, 646 So. 2d at 1369 (quoting Comment b to § 768, Restatement (Second) of Torts):

> One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor. And he may seek to do so directly by express inducement as well as indirectly by attractive offers of his own goods or services.

Further, "[t]he competitor's privilege applies when the contract involved is terminable at will or when the defendant causes a third person not to enter into a prospective contract with another who is his competitor." *Id.* Such situation is exactly the type of situation involved in the case at bar. Thus, even if plaintiffs could establish a prima facie case of tortious interference with business or contractual relations, the competitors privilege immunizes defendants from any liability.

B.     **Unfair Trade Practices Act**

Plaintiffs contend that defendants' conduct "violate[s] Alabama Code §§ 8-10-1 et seq. and 6-5-60 as being an unlawful restraint of trade and constitut[es] unfair trade practices." (Compl. at ¶ 45.) However, in their brief in opposition to Defendants' Motion for Summary Judgement on Plaintiffs' Tortious Interference and Unfair Trade Practices Claims, plaintiffs fail to defend this claim. Although a court may not grant a motion for summary judgment simply because the motion goes unopposed, it may do so if summary judgment is otherwise appropriate.

11

Applying the standards governing summary judgment to the facts of this case, the court concludes that there is no genuine issue as to any material fact regarding plaintiffs' claim under the Unfair Trade Practices Act, and defendants are entitled to judgment as a matter of law on this claim. Plaintiffs have not come forward with *any* evidence, much less evidence showing a dispute as to any factual contention on this claim. Thus, plaintiffs have not only failed to meet their burden "to go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex,* 477 U.S. at 324, but also, and more importantly, the facts and law applicable to this case warrant granting summary judgment for defendants.

Plaintiffs' claim under the Alabama antitrust statutes is nothing more than a recital of the allegations contained in their federal antitrust claim. (*See* Compl. at ¶¶ 19-29, 35-37, 44-45.) Alabama's antitrust laws, both statutory and common law, are analytically identical to federal antitrust laws and are interpreted by Alabama courts in accordance with federal law. *See Ex parte Rice,* 67 So. 2d 825, 829 (Ala. 1953). As stated in *Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper,* 746 So. 2d 966, 986, 988 (Ala. 1999):

> The federal statutes, Sherman and Clayton Acts, prescribe the terms of unlawful monopolies and restraints of trade as they should also be administered in Alabama. . . . Although what is now § 6-5-60 (providing for a civil cause of action) was enacted a little over 16 years after what are now § 8-10-1, § 8-10-2, and § 8-10-3 (prescribing criminal penalties), all of these statutes are part of a uniform system of regulation, in the sense that they are all directed toward punishing or providing redress for activities in restraint of trade. Related statutes of this kind should, when possible, be construed in pari materia.

(quotations and citations omitted). Because the court has previously granted summary judgment as to plaintiffs' Robinson-Patman claim, and because the Alabama antitrust statutes are to be construed in accordance with the federal antitrust statutes, the court concludes that defendants are entitled to judgment as a matter of law on plaintiffs' Alabama Unfair Trade Practices Act

12

claim.

### III. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment on Plaintiffs' Tortious Interference and Unfair Trade Practices Claims is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 9th day of January, 2001.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge